# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MICHAEL BARHAM, | : |
|     Plaintiff, | : |
| | :     CIVIL CASE NO. |
| v. | :     3:12-CV-01361 (VAB) |
| | : |
| WAL-MART STORES, INC. and | : |
| WAL-MART STORES EAST, L.P., | : |
|     Defendants. | : |

## MEMORANDUM AND RULING RE: ECONOMIC DAMAGES AND DEFENDANTS' MOTION FOR REMITTITUR

On March 8, 2017, a jury awarded Michael Barham ("Plaintiff") compensatory and punitive damages against Wal-Mart Stores, Inc. and Wal-Mart Stores East, L.P. ("Walmart" or "Defendants"). An evidentiary hearing was held on May 30, 2017 to determine economic damages. The parties dispute the amount of economic damages in this case. Walmart also seeks remittitur as to compensatory damages and the application of a statutory damages cap as to punitive damages. Mot. for Remittitur, ECF No. 593.

In this memorandum and ruling, the Court addresses Walmart's request for remittitur and sets forth its findings of fact and conclusions of law with respect to economic damages. For the reasons outlined below, Walmart's [593] Motion for Remittitur with respect to non-economic damages is **GRANTED IN PART AND DENIED IN PART**. Consistent with applicable law, the Court reduces the compensatory damages award to $125,000 and the punitive damages award to $175,000. With respect to the economic damages, the Court orders Walmart to reinstate Mr. Barham and award him back pay in the amount of $238,678 with applicable pre-judgment interest.

# I.      MOTION FOR REMITTITUR

At the conclusion of trial in this matter, the jury found for Mr. Barham on his Title VII retaliatory failure to rehire claim.  The jury awarded Mr. Barham a total of $550,000 in compensatory damages and an additional $5,000,000 in punitive damages.  Walmart seeks an order of remittitur reducing both of these amounts to a total of $150,000.

## A.  Standard of Review

"Remittiturs are a common procedure used by the courts to, in effect, reduce the amount of a damage award that the court concludes is impermissibly high." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 167 (2d Cir. 2014).  "Remittitur is appropriate in two situations: '(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, and (2) more generally, where the award is "intrinsically excessive" in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.'" *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015) (quoting *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998)).

"Where there is no particular discernable error . . . a jury's damage award may not be set aside as excessive unless 'the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) (quoting *Kirsch*, 148 F.3d at 165).  The Court applies this "shocks the conscience" standard when reviewing a motion for remittitur as to a federal claim.  *See Stampf v. Long Island R. Co.*, 761 F.3d 192, 206 (2d Cir. 2014) (noting distinction between "the federal 'shocks the conscience' standard" and New York state law standard); *Port Auth. Police Asian Jade Soc. Of N.Y. & N.J. Inc. v. Port Auth. of N.Y. & N.J.*, 681 F. Supp. 2d 456, 469 (S.D.N.Y. 2010) ("When federal law provides the

cause of action, remittitur is appropriate when the jury award includes an identifiable error of a quantifiable amount or is so high as to 'shock the conscience.'") (citing *Kirsch*, 148 F.3d at 165).

When considering a motion for remittitur, "a court should look to awards in comparable cases, bearing in mind the unique facts and circumstances of each case." *Graham v. City of N.Y.*, 128 F. Supp. 3d 681, 713-14 (E.D.N.Y. 2015) (citing *Stampf*, 761 F.3d at 204, *Dotson v. City of Syracuse*, 549 F. App'x 6, 8 (2d Cir. 2013), and *Tretola v. Cty. of Nassau*, 14 F. Supp. 3d 58, 83 (E.D.N.Y. 2014)). Because "'awards for mental and emotional distress are inherently speculative' and the judicial system 'has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable and proportionate,' greater scrutiny is given to large jury awards for mental and emotional harm to ensure that they are in line with comparable cases." *Id.* at 714 (quoting *Turley*, 774 F.3d at 162). "[W]hen juries grant large compensatory awards for intangible and unquantifiable injuries, such as emotional distress, pain, and suffering," the trial court's discretion is under "substantial constraints." *Turley*, 774 F.3d at 162 (quoting *Stampf*, 761 F.3d at 205).

### B. Discussion

Walmart asks the Court to limit the jury's compensatory and punitive damages awards in accordance with the $300,000 statutory cap on non-economic damages. Def. Mem. in Supp. at 3, ECF No. 594. Walmart also seeks a further reduction below the statutory cap for a resulting damages award of $50,000 in compensatory damages and $100,000 in punitive damages. *Id.* Mr. Barham agrees that the damages award must be subject to the statutory cap; however, he argues that any reduction below the combined statutory maximum of $300,000 would be inappropriate in this case. Pl. Mem. in Opp., ECF No. 604.

### 1. Statutory Cap

42 U.S.C. § 1981a limits the "sum of the amount of compensatory damages awarded …
for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of
enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages" that may
be awarded in Title VII cases.  42 U.S.C. § 1981a(b)(3).  Under this statutory restriction,
employers with "more than 500 employees" may not be ordered to pay compensatory and/or
punitive damages in excess of $300,000.  42 U.S.C. § 1981a(b)(3)(D).

The only claim on which the jury found in favor of Mr. Barham was a retaliation claim
under Title VII.  Thus, the jury's verdict is subject to the limitations described in 42 U.S.C. §
1981a, and the Court limits the jury's combined compensatory and punitive damages award to a
total of no more than $300,000.

### 2. Compensatory Damages

Walmart argues that the jury's non-economic compensatory damages award should be
reduced from $550,000 to $50,000.  According to Walmart, the evidence presented at trial
supported only "garden-variety" emotional distress, thus any award above $50,000 would be
excessive in light of compensatory damages awards given in comparable cases.  Mr. Barham, on
the other hand, insists that $50,000 is too low, arguing that Walmart's characterization
misrepresents the totality of the evidence regarding the severity of Mr. Barham's non-economic
damages.

"Emotional distress awards within the Second Circuit can generally be grouped into three
categories of claims: garden-variety, significant, and egregious." *Graham*, 128 F. Supp. 3d at
714 (quoting *Olsen v. Cty. of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009)) (internal
quotation marks omitted). "In 'garden variety' emotional distress claims, the evidence of mental

suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." *Olsen*, 615 F. Supp. 2d at 46 (internal quotation marks omitted). "Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration." *Id.* (internal quotation marks and alteration omitted).

In contrast, "significant" emotional distress claims "are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." *Id.* at 46-47 (internal quotation marks omitted). "Egregious" emotional distress claims generally involve "either outrageous or shocking discriminatory conduct or a significant impact on the physical health of the plaintiff." *Id.* at 47 (internal quotation marks omitted); *e.g., Caravantes v. 53rd Street Partners, LLC*, No. 09 Civ. 7821 (RPP), 2012 WL 3631276, at *22–23 (S.D.N.Y. Aug. 23, 2012) (employee subjected to unwanted sexual acts suffered "significant" emotional distress where harassment led to social isolation, trouble sleeping, sexual dysfunction, marital problems, depressive disorder, post-traumatic stress disorder, and hospital admission for suicidal ideation; plaintiff's testimony was corroborated by wife and treating psychologist); *Thorsen v. Cty. of Nassau*, 722 F. Supp. 2d 277, 292 (E.D.N.Y. 2010) (emotional distress was not "garden variety" where plaintiff saw therapist twice weekly for six months, and both plaintiff and therapist testified at length regarding Plaintiff's anxiety and depression, physical symptoms, and "major stress attack" requiring hospitalization).

This case falls within the first category of emotional distress awards, "garden-variety" distress.[1]  At trial, testimony regarding Mr. Barham's emotional distress came exclusively from

---

[1] The use of the term "garden variety," in no way minimizes Mr. Barham's emotional distress, but rather places that harm into context, consistent with the applicable case law.

Mr. Barham – no other witnesses testified to confirm the claimed emotional harm, and neither

Mr. Barham nor any other witness presented any medical evidence suggesting that Mr. Barham's

emotional harm had physical or medical ramifications.  Mr. Barham described his emotional

harm in general terms, stating that he "felt dehumanized" and that he used to be "more upbeat"

before the events at issue in this case.  *See* Barham Trial Tr. II., 112:7-12, ECF No. 563.  He also

confirmed that he did not seek treatment from a psychiatrist or counselor as a result of his

distress, explaining that he did not "have any wires loose" and did not feel that he needed mental

health services.  *Id.* at 235:11-12.

Mr. Barham did testify that he lost joint custody of his child as a result of Walmart's

actions.  *Id.* at 235:4 – 236:11.  According to Mr. Barham, his relocation to a lower-level position

in New York following Walmart's refusal to re-hire him in his old position prevented him from

visiting his child, making child support payments, and attending court dates, resulting in the loss

of joint custody in 2011.  *Id.*  Beyond Mr. Barham's general descriptions of his emotional state,

this loss of custody is the only concrete example offered regarding his non-economic damages –

he did not testify as to any permanent injury or physical impact of his alleged emotional distress,

and he did not offer any corroborating testimony, medical or otherwise, regarding his emotional

state.  Nevertheless, the impact of the loss of joint custody of a child is significant enough to

warrant damages for "garden-variety" emotional distress near to or at the top of the permissible

range.

The Court concludes that, on consideration of all evidence offered at trial, Mr. Barham

has established "garden-variety" emotional distress.  *See, e.g., Johnson v. Strive E. Harlem*

*Emp't Grp.*, 990 F. Supp. 2d 435, 456-57 (S.D.N.Y. 2014) (plaintiff proved "garden variety"

emotional distress "at best" where she relied on her own testimony regarding her emotional

reaction to racial epithets and sexual harassment at work, her loss of energy and confidence, crying, becoming a less effective parent, having trouble sleeping, and seeing two therapists; plaintiff offered no corroborating testimony, nor any evidence of physical manifestations of her distress); *Abel v. Town Sports Int'l, LLC*, No. 09 Civ. 10388 (DF), 2012 WL 6720919, at *16 (S.D.N.Y. Dec. 18, 2012) (finding "garden variety" emotional distress where plaintiff offered evidence, corroborated by other witnesses, that he was hurt, stressed, "not himself," and gained weight); *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 561 (S.D.N.Y. 2012) (plaintiff's testimony that his work environment was "horrible" because of racial harassment, and daughter's testimony that plaintiff was "always sad" and "wasn't his same self," without evidence of physical manifestations or disruption of daily life, demonstrated "garden variety" emotional distress "at best").

"In the Second Circuit, 'garden variety emotional distress claims generally merit $30,000 to $125,000 awards.'" *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 561 (S.D.N.Y. 2012) (quoting *Olsen*, 615 F. Supp. 2d at 46) (internal marks omitted); *see also Patterson v. Balsamico*, 440 F.3d 104, 120 (2d Cir.2006) (upholding the jury's $100,000 compensatory damages award where "the plaintiff offered testimony of his humiliation, embarrassment, and loss of self-confidence, as well as testimony relating to his sleeplessness, headaches, [and] stomach pains"); *Vera v. Alstom Power,* 189 F. Supp. 3d 360, 379 (D. Conn. 2016) (granting remittitur of non-economic damages award to "$125,000, which is near the top of the range in 'garden variety' emotional distress cases...."), *appeal dismissed* (Aug. 16, 2016); *DeCurtis v. Upward Bound Int'l, Inc.*, No. 09 Civ. 5378 (RJS), 2011 WL 4549412, at *4 (S.D.N.Y. Sept. 27, 2011) ("A review of the relevant case law in this jurisdiction reveals that plaintiffs with garden-variety claims generally receive between $30,000 and $125,000.")

Taking into consideration the jury's apportionment of non-economic damages relative to punitive damages, which are discussed in further detail below, together with the limitations imposed by the statutory cap under Title VII, the Court hereby orders a remittitur of non-economic damages to $125,000.

### 3. Punitive Damages

Walmart seeks an additional reduction of punitive damages to no more than $100,000. In support of this request, Walmart contends that there is "no evidence of repeated misconduct" on the part of Walmart, insisting that its misconduct was only limited to "**one** position – the Waterford MAPM position filled in February 2011." Def. Mem. in Supp. at 11, ECF No. 594. Mr. Barham, on the other hand, argues that Walmart's request contradicts the substantial evidence offered at trial suggesting repeated and deliberate retaliation on the part of Walmart. Pl. Mem. in Opp., ECF No. 604. The Court agrees with Mr. Barham.

Punitive damages are appropriate under Title VII if the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). Malice and reckless indifference refer to "the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). "[A]n employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id*. at 536. When reviewing a punitive damages award, the "most important" guidepost is "the degree of reprehensibility of the defendant's conduct." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).

The jury appropriately found that a significant punitive damages award is warranted in this case. While Walmart correctly notes that the Court limited Mr. Barham's retaliation claim to Walmart's refusal to hire Mr. Barham for one specific position, at trial, Walmart was unable to provide a consistent reason for its rejection of Mr. Barham's application, permitting the jury to conclude that Walmart willfully retaliated against Mr. Barham. *See* Barham Trial Tr. VI, 1385:15-22, 1453:7-16, ECF No. 567 ("Q. What was the direction that you issued to your divisionals? ... A. That our MAPMs, the individuals in the MAPM role that were banded red would not be considered for open MAPM positions ... Q. So you understand that Walmart told Mr. Barham that the reason that he was being terminated was because his job was being eliminated, correct? A. That's my understanding of how it was conveyed to him, yes. ... Q. Is it true that he was terminated because his job was eliminated? A. No.").

Furthermore, Mr. Barham presented direct evidence at trial suggesting that the relevant decision-makers knowingly refused to re-hire Mr. Barham for retaliatory reasons, in violation of both company policy and federal law. *See, e.g.* Barham Trial Tr. V, 780:18-22 ("Q. Would you ever hire somebody – when you were at Walmart as a regional, would you have ever hired somebody who had brought a discrimination and retaliation lawsuit against Walmart? A. No, I would not."). The Court finds that, in light of all the evidence admitted at trial, the jury reasonably awarded significant punitive damages to Mr. Barham based on Walmart's actions.

As discussed previously, the language of Title VII limits total non-economic damages awards for employers with at least 500 employees to no more than $300,000. The Court notes that Walmart is an employer whose size far exceeds the maximum contemplated by this statute, suggesting that even a punitive damages award far above this maximum would not necessarily "shock the judicial conscience" in light of Walmart's size and its conduct in this case. *Lore*, 670

F.3d at 177. Nevertheless, the Court is bound by the law and, in light of the statutory limits, a punitive damages award of $175,000 appropriately reflects the malice and reckless indifference present in the evidentiary record here. Together with a reduced compensatory damages award of $125,000, this reduced punitive damages award results in the maximum non-economic damages award of $300,000 allowable by law.

### C. Conclusion

Walmart's motion for remittitur is granted in part and denied in part. With respect to Walmart's request that the total non-economic damages award be reduced within the statutory maximum of $300,000, Walmart's motion is granted. However, with respect to Walmart's request that these damages be further reduced to a total of $150,000, Walmart's motion is denied. The Court orders compensatory damages in the amount of $125,000 and punitive damages in the amount of $175,000 for a total non-economic damages award of $300,000, the statutory maximum.

## II. ECONOMIC DAMAGES

On May 30, 2017, the Court held an evidentiary hearing regarding economic damages. Minute Entry, ECF No. 585. In advance of the hearing, the parties submitted proposed findings of fact and conclusions of law, Pl. Prop. Findings, ECF No. 571; Def. Prop. Findings, ECF No. 570, as well as response briefs, Pl. Reply Br., ECF No. 576; Def. Reply Br., ECF No. 575. The Court now outlines its findings regarding economic damages. As explained in further detail below, the Court orders a total economic damages award of $238,678 and related pre-judgment interest, as well as reinstatement to a MAPM position in Connecticut.

## A.  Standard of Review

"In order to recover damages, a claimant must present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages.... [T]he [factfinder] is not allowed to base its award on speculation or guesswork." *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992); *see also Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 308 (S.D.N.Y. 2008) ("[I]t is plaintiff's burden to present a non-speculative basis for determining economic damages."); *Wang v. Yum! Brands, Inc.*, No. 05–CV–1783, 2007 WL 1521496, at *6 (E.D.N.Y. May 22, 2007) (precluding plaintiffs from offering evidence on the issue of economic damages where "plaintiffs' sole evidence as to the amount of ... lost wages [was] ... unsubstantiated testimony").

"When an employer violates Title VII, a court may award back pay to make the employee whole." *Vera*, 189 F. Supp. 3d at 384.  "'The purpose of back pay is to completely redress the economic injury the plaintiff has suffered as a result of discrimination.'  The back pay award, therefore, may include lost wages, and anticipated raises and/or fringe benefits." *Becerril v. East Bronx Child Dev. Ctr.*, No. 08 Civ. 10283 (PAC) (KNF), 2009 WL 2611950, at *3 (S.D.N.Y. Aug. 18, 2009), *report and recommendation adopted sub nom. Becerril v. East Bronx NAACP Child Development Ctr.*, No. 08 CIV. 10283 (PAC) (KNF), 2009 WL 2972992 (S.D.N.Y. Sept. 17, 2009) (quoting *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993)).

Under Title VII, an award of back pay "is the rule, not the exception." *Carrero v. N.Y.C. Hous. Auth.*, 890 F.2d 569, 580 (2d Cir. 1989).  Front pay, on the other hand, is a remedy "awarded at the discretion of a district court where reinstatement is inappropriate and the plaintiff has been unable to find another job." *Bergerson v. New York State Office of Mental Health*, 652 F.3d 277, 286 (2d Cir. 2011).

**B. Discussion**

The parties presented widely divergent visions of Mr. Barham's economic damages in this matter. It is undisputed that Mr. Barham was employed by Walmart as a Market Asset Protection Manager ("MAPM") in Waterford, Connecticut until January 2010, when Walmart terminated him from this position in connection with a company-wide reorganization, and that Walmart rejected his candidacy for that same position in February 25, 2011. It is also undisputed that he was unable to find subsequent employment until May 21, 2011, when he was re-employed by Walmart in the position of Co-Manager in Rensselaer, New York. Both parties recognize that Mr. Barham's entitlement to economic damages in this matter rests primarily on the difference between his earnings as a MAPM and his earnings as a Co-Manager.

According to Mr. Barham, he suffered a substantial decrease in income when Walmart terminated his employment as a MAPM and refused to re-hire him in the same role. He claims that he earns a much lower salary as a Co-Manager in New York than he did as a MAPM in Connecticut, and that he also lost access to an assortment of benefits he once enjoyed as a MAPM, such as access to a company-provided car. Accordingly, he insists that, even after offsetting his damages based on his earnings as a Co-Manager, he is entitled to over $1,000,000 in back pay.

Walmart, on the other hand, argues that Mr. Barham earns essentially the same amount in his new role as a Co-Manager as he did in his previous as a MAPM, therefore his entitlement to back pay ended as soon as he was re-hired in May 2011 and any award of front pay would be inappropriate. Def. Prop. Findings at 7, ECF No. 570. Walmart claims that, while Mr. Barham's gross pay as a MAPM may have once been higher than his current earnings as a Co-Manager, Mr. Barham's base salary is the same in both positions, and his bonus eligibility as a Co-

Manager is actually higher than his bonus potential was as a MAPM. Def. Reply Br. at 6-7, ECF No. 575.

The Court concludes that Mr. Barham's actual eligibility for economic damages is not fully accurately reflected in either party's representations. Based on the evidence before the Court, Mr. Barham earned less money as a Co-Manager than he did as a MAPM. Thus, in light of the jury's determination that Walmart's failure to re-hire Mr. Barham for the MAPM position in Waterford, Connecticut in 2011 was a retaliatory act in violation of Title VII, Mr. Barham is entitled to an award of back pay representing the difference in earnings between the two positions.[2]

However, Mr. Barham has failed to establish an entitlement to back pay with respect to various benefits he enjoyed as a MAPM in addition to his base salary and bonus pay, including his access to a company-provided vehicle and a specific award to account for the tax consequences of any back pay in this case. Furthermore, in light of Walmart's own assertions that several MAPM positions have opened up in Connecticut following Mr. Barham's employment as a Co-Manager and Mr. Barham's assertions that he is ready and willing to return to work in this capacity, *see* Def. Reply Br. at 13, ECF No. 575, the Court concludes that reinstatement, rather than front pay, is the appropriate remedy in this case to address any future lost wages as a result of Walmart's retaliation.

---

[2] In addition to offsetting the back pay award by the amount Mr. Barham earns as a Co-Manager, Walmart insists that this award must be offset by any unemployment compensation Mr. Barham received between his rejection from the MAPM position in Waterford, Connecticut in February 2011 and his re-employment as a Co-Manager that May. Def. Prop. Findings at 5, 9-10, ECF No. 570. However, such a reduction lies within the Court's discretion, and the Court declines to deduct Mr. Barham's back pay award based on his brief receipt of any such assistance. *See EEOC v. Enterprise Ass'n Steamfitters Local No. 638*, 542 F.2d 579, 591-92 (2d Cir. 1976), cert. denied, 430 U.S. 911 (1977) (noting that common law authority would support refusal to deduct "public assistance" from Title VII back pay award but that applying such an offset would not be an abuse of discretion); *Bonura v. Chase Manhattan Bank, N.A.*, 629 F.Supp. 353, 361 (S.D.N.Y. 1986) ("The Court in its discretion declines to subtract from plaintiff Mousseau's gross back pay award the amount he received in unemployment insurance benefits following his involuntary departure from Chase.").

### 1. Back Pay

Mr. Barham's income tax documentation succinctly outlines his respective earnings as a MAPM and as a Co-Manager.  *See* 2009-10, 2015-16 W-2s, Pl. Exs. 59-62.  Mr. Barham's annual W-2 forms show that, during his last full year as a MAPM, he was earning an income of $94,182.  2009 W-2, Pl. Ex. 59.  According to his Social Security statement, Mr. Barham's income grew as a MAPM grew substantially during his last five years in this role – these records confirm that he went from earning less than $80,000 in 2006 to earning over $90,000 in 2009.  Soc. Sec. Record, Pl. Ex. 69.

Mr. Barham's subsequent employment as a Co-Manager, however, was not as well-compensated as his previous employment as a MAPM.  In 2012, his first full year as a Co-Manager, his W-2s show total earnings of $58,327, over $35,000 less than he earned as a MAPM in 2009.  2012 W-2, Pl. Ex. 64.  This number did increase over time, but it never increased by enough to surpass his earnings as a MAPM – by 2016, Mr. Barham was earning a total income of $79,465, which is over $20,000 more than he made during his first full year as a Co-Manager, but still over $14,000 less than he made in 2009 during his final full year as a MAPM.  2016 W-2, Pl. Ex. 68.

The parties agree that these total annual earnings consist primarily of base salary and bonuses, and that, for several years of his employment as a MAPM, these earnings also included "geographical adjustments" for which Mr. Barham is not eligible as a Co-Manager.  The parties focused a significant portion of their filings and testimony on the specific breakdown of these earnings, debating exactly how much could be attributed to base salary as opposed to bonus or geographical pay adjustments.  These distinctions, however, are ultimately not relevant to the Court's findings regarding back pay.

Walmart has testified that there is no meaningful difference between Mr. Barham's respective earnings as a MAPM and as a Co-Manager because the base salary is the same between the two jobs and the bonus potential is higher for a Co-Manager. *See* Def. Prop. Findings at 4-5, ECF No. ECF No. 570 (stating that Mr. Barham was rehired "with a comparable base pay" and noting that "[d]uring his tenure as a MAPM, Mr. Barham was eligible for bonuses in an amount up to 24% of his base salary" while "[t]he bonus eligibility of Co-Managers is up to 45% of their base salary"). The record evidence, however, unequivocally demonstrates that Mr. Barham actually experienced a decrease in his annual earnings as a result of Walmart's refusal to re-hire him into his previous position. Thus, in order to make Mr. Barham whole for Walmart's retaliatory refusal to rehire him as a MAPM, back pay is required from the date of Walmart's retaliation, February 25, 2011, through the date of judgment, October 27, 2017.

### a. Income Growth

Mr. Barham asks the Court to calculate back pay on the assumption that, had he been rehired in 2011, his earnings as a MAPM would have continued to grow at the rate they were growing for the last seven years of his employment. Based on the Social Security record of his compensation from 2002 until 2009, Mr. Barham has demonstrated that his compensation as a MAPM grew at an average rate of 9.79% each year leading up to his termination. Pl. Prop. Findings at 5, ECF No. 571.[3] According to Mr. Barham, if this average growth rate were to have steadily continued through 2017, Mr. Barham would be making a total income of $183,889.90, increasing the gap between his rightful earnings as a MAPM and his earnings as a Co-Manager and thereby increasing his eligibility for back pay. *Id*. at 6.

---

[3] Walmart notes that Mr. Barham was not promoted to the role of MAPM until February 2006. Def. Reply Br. at 12, ECF No. 575. Furthermore, the growth rate of Mr. Barham's income during the referenced time period varied widely from year to year, ranging from 5.1% to 19.9% during this 7-year period. Pl. Prop. Findings at 13, ECF No. 571.

Mr. Barham, however, has not provided the Court with reliable evidence that his income would have continued to grow consistently at this rate through 2017. As noted previously, the Court "is not allowed to base its award on speculation or guesswork." *Sir Speedy, Inc.*, 957 F.2d at 1038. Walmart presents a strong challenge to Mr. Barham's proposal regarding income growth, correctly noting that Mr. Barham's income growth from year to year was far from a linear progression and further pointing out that Mr. Barham's calculations erroneously include his earnings in lower-level roles before being promoted to the position of MAPM in February 2006. Def. Reply Br. at 5, ECF No. 575.

By asking the Court to assume future income growth without establishing a factual basis for the Court to conclude that Mr. Barham would actually be earning that income, if he were employed as a MAPM in 2011, Mr. Barham invites the Court to engage in speculation not permitted by the law. While it is likely, given past income growth, that Mr. Barham's income would have continued to grow to some extent had he been re-hired as a MAPM, the plaintiff bears the burden of establishing eligibility for economic damages, and the Court cannot order a back pay award that is not supported by the record. *See Tse*, 568 F. Supp. 2d at 308. Thus, the back pay award here does not assume consistent growth at a rate of 9.71% each year, but instead assumes growth consistent with the testimony provided by Dr. Walter Dolde, Plaintiff's expert.

Dr. Dolde testified that a reasonable and conservative estimate of income growth was a yearly rate of 1.92%. Dolde Report, Pl. Prop. Findings Ex. B, ECF No. 571-1. Walmart has not effectively rebutted this estimate. Indeed, during the economic damages hearing, a Walmart employee, Lauri Canales, testified personally that she experienced income growth of between 2 to 4% annually. As a result, the Court finds that Dr. Dolde's estimate of yearly income growth of 1.92% fairly accounts for the income growth Mr. Barham more than likely would have

experienced, if he had not been retaliated against by Walmart and instead continued to be in a MAPM position.

Accordingly, the Court awards lost wages in the amount of $238,678. This amount assumes that Mr. Barham would have consistently made annual earnings of at least $94,182 from his rejection from the MAPM job in February 2011 and includes annual increases in income growth of 1.92% until the date of judgment on October 27, 2017,[4] offset by the amount of Mr. Barham's documented annual earnings as a Co-Manager. *See* 2011-16 W-2s, Pl. Exs. 63-68.[5]

### b. Taxes and Fringe Benefits

In addition to lost wages, Mr. Barham seeks an award representing the complete tax liability of a lump-sum damages award. Pl. Prop. Findings at 4-5, ECF No. 571. Plaintiffs are not guaranteed such awards in connection with back pay determinations. *See, e.g. Morgenstern v. Cty. of Nassau*, No. CV 04-58 (ARL), 2009 WL 5103158, at *6 (E.D.N.Y. Dec. 15, 2009) ("Although there is precedent for such an award, the court declines to award the plaintiff an additional monetary amount to offset the increased tax consequences of the economic damages award she will receive.") (citing cases); *Gulino v. Bd. of Educ. Of the City Sch. Dist. of the City of New York*, No. 98-CV-8414 (KMW), 2016 WL 4129111, at *3 (S.D.N.Y. Aug. 3, 2016) ("[A] tax gross-up is appropriate when necessary to make a claimant whole... However... there may be cases where a tax adjustment lowers, rather than increases, awards....").

---

[4] Incorporating Dr. Dolde's 1.92% estimated income growth each year, Mr. Barham's earnings as a MAPM were calculated as annual earnings of approximately $97,833 in 2011; $99,712 in 2012; $101,626 in 2013; $103,577 in 2014; $105,566 in 2015; $107,593 in 2016; and an estimated $73,105 through October 2017. These amounts represent full years of earnings, beginning in February 2011, with an additional eight months in 2017 through the date of judgment (October 27, 2017).

[5] According to Mr. Barham's W-2 forms, his annual earnings during his time as a Co-Manager from 2011 to 2017 are as follows: $40,945 in 2011, $58,327 in 2012, $76,623 in 2013, $73,400 in 2014, $68,598 in 2015, and $79,465 in 2016, and approximately $52,976 for 2017. *Id.* The 2017 figure represents a final eight months of estimated earnings through the date of judgment, October 27, 2017, at the same rate earned in 2016. *Id.*

Mr. Barham has presented evidence that the tax consequences of his damages award require a separate lump sum taxes award, which in turn must be "grossed-up" to cover any accompanying tax consequences of that tax award. Dolde Reports, Pl. Prop. Findings Exs. A-E, ECF No. 571-1. Mr. Barham's tax calculations, however, appear to be based on a lost wages award of over $600,000, far in excess of the Court's calculations. *Id.* This amount incorporates detailed projections regarding Mr. Barham's retirement benefits as well as additional expenses in connection with Mr. Barham's loss of access to a company vehicle, which Walmart provided him in his role as a MAPM but failed to provide him in his role as a Co-Manager. *Id.*; *see also* Pl. Prop. Findings at 8-9, ECF No. 571 (claiming that Mr. Barham is eligible for an additional award representing the costs of gas, tolls, and car maintenance during his seven years as a Co-Manager, totaling "thousands of dollars").

Mr. Barham, however, has failed to establish his eligibility for back pay with respect to the fringe benefits incorporated into his proposed tax award. The testimony of the parties reveals that Walmart provided Mr. Barham a vehicle in connection with his role as a MAPM because, in order to effectively perform the responsibilities of that position, he needed the vehicle to travel to multiple stores. When Mr. Barham transitioned to the position of Co-Manager, which focuses on only one store, Mr. Barham no longer needed a vehicle. *See* Def. Reply Br. at 8, ECF No. 575. Furthermore, Mr. Barham never provided any documentation or evidence specifically establishing what amount would be required to make him whole for vehicle-related expenses.

Accordingly, the Court rejects Mr. Barham's proposed lost wages calculations, and his request for compensation related to his loss of access to a company car is denied.[6]

Mr. Barham has failed to clearly provide the Court with evidence concretely establishing that a grossed-up tax award is required to make him whole, nor has he established the specific amount that would be required for such an award in light of the Court's limited findings regarding lost wages. Accordingly, Mr. Barham's request with respect to a tax award is denied.

### c. Pre-Judgment Interest

Finally, Mr. Barham seeks pre-judgment interest in the amount of 10% per year, the statutory rate established for the state of Connecticut. Pl. Prop. Findings at 11-12, ECF No. 571 ("Because there is no Federal statute that purports to control the rate for prejudgment interest, the Court should apply the rate of ten percent (10%) per year in accordance with Conn. Gen. Stat. §37-3a(a)."). The decision to award prejudgment interest is left to the sound discretion of the court, and it is ordinarily considered an abuse of discretion not to award pre-judgment interest when awarding lost wages. *See Gierlinger v. Gleason*, 160 F.3d 858, 873 (2d Cir. 1998); *Saulpaugh,* 4 F.3d at 145 ("Given that the purpose of back pay is to make the plaintiff whole, it can only be achieved if interest is compounded."). "Awarding prejudgment interest in such cases prevents the defendant employer from attempting to 'enjoy an interest-free loan for as long as it can delay paying out back wages' ... and helps to ensure that the plaintiff is meaningfully made whole." *Gierlinger*, 160 F.3d at 874 (quoting *Saulpaugh*, 4 F.3d at 145).

---

[6] The parties also refer to Mr. Barham's alleged entitlement to an award reflecting the change in medical coverage, stock options and retirement benefits. However, Mr. Barham never clearly establishes the loss of these benefits in his new capacity as Co-Manager, nor does he establish the amounts required to make him whole following Walmart's retaliation. Accordingly, the Court denies Mr. Barham's requests for back pay with respect to these benefits as well.

Mr. Barham's calculation of the applicable pre-judgment interest in this case is erroneous. When economic damages are based at least in part on federal claims, "courts in this circuit uniformly have applied a federal interest rate, most commonly based on the average rate of return on one-year Treasury bills ('T-bills') for the relevant time period." *Kuper v. Empire Blue Cross & Blue Shield*, No. 99 CIV. 1190 (JSG) (MHD), 2003 WL 23350111, at *3 (S.D.N.Y. Dec. 18, 2003), *report and recommendation adopted*, No. 99-CV-1190, 2004 WL 97685 (S.D.N.Y. Jan. 20, 2004) (citing 28 U.S.C. § 1961(a); citing cases). 28 U.S.C. § 1961(a) outlines the federal pre-judgment interest standard, which provides that "[s]uch interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." *Id.*

"Calculating the award should be done as follows: 'First, the award [] should be divided pro rata over the appropriate time period. Second, once the award is divided, the average annual United States treasury bill rate of interest referred to in 28 U.S.C. § 1961 will be applied. Third and finally, in order to guarantee complete compensation to the plaintiff, the interest will be compounded annually.'" *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 264 (S.D.N.Y. 2007) (quoting *Robinson v. Instructional Systems, Inc.*, 80 F. Supp. 2d 203, 208 (S.D.N.Y. 2000) (citations omitted)). Accordingly, Mr. Barham is directed to use this methodology to calculate the interest on the back pay award of $238,678 from February 25, 2011 to the judgment date of October 27, 2017. *See id.*

### 2. Front Pay / Reinstatement

In addition to back pay, Mr. Barham seeks a substantial award of front pay spanning fifteen years. Pl. Prop. Findings at 18, ECF No. 571. Walmart contends that Mr. Barham is not

eligible for front pay because there is no difference between his earnings as a Co-Manager and his earnings as a MAPM, an argument that the Court has already rejected. Def. Prop. Findings at 5, ECF No. 570. The Court agrees that front pay is not appropriate here and orders reinstatement instead.

"[R]einstatement is a preferred remedy in employment discrimination cases... However, courts are hesitant to order reinstatement under certain circumstances, including 'where there is animosity between an employer and an employee.'" *Sass v. MTA Bus Co.*, 6 F. Supp. 3d 238, 252-53 (E.D.N.Y. 2014) (quoting *Bergerson*, 651 F.3d at 287-88); *see also Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 193 (2d Cir. 2011) ("[O]ur Circuit favors reinstatement as a remedy in employment cases generally."); *Reiter v. MTA N.Y.C. Transit Auth.*, 457 F.3d 224, 252-53 (2d Cir. 2006) (observing that "[u]nder Title VII, the best choice is to reinstate the plaintiff, because this accomplishes the dual goals of providing make-whole relief for a prevailing plaintiff and deterring future unlawful conduct"). The Court concludes that reinstatement is the proper remedy here.

Mr. Barham currently works for Walmart as a Co-Manager, suggesting that any animosity between the parties is not sufficient to prevent a functional working relationship. Furthermore, Mr. Barham has already demonstrated that he is capable of performing the work required of a MAPM, as he successfully held this position for a number of years, and the evidence presented at trial confirmed that Walmart has had numerous openings for this position over the years throughout the state of Connecticut. Accordingly, the Court orders that Walmart reinstate Mr. Barham in a Market Asset Protection Manager position in the state of Connecticut.

**C. Conclusion**

The Court orders Walmart to reinstate Mr. Barham to a MAPM position in the state of Connecticut.  The Court also orders back pay in the amount of $238,678, together with prejudgment interest on that amount, calculated in accordance with 28 U.S.C. § 1961 spanning from February 25, 2011 through the date of entry of judgment on October 27, 2017.

**III.    CONCLUSION**

Walmart's [593] Motion for Remittitur with respect to non-economic damages is **GRANTED IN PART AND DENIED IN PART**.  With respect to economic damages, the Court orders Walmart to reinstate Mr. Barham and award him back pay in the amount of $238,678, together with the applicable pre-judgment interest.

To resolve this case in its entirety, Mr. Barham is to file a motion for attorney's fees and costs by no later than Friday, September 15, 2017; Walmart's response to Mr. Barham's calculations is due by Friday, September 29, 2017, and any reply to Walmart's response is due by Friday, October 6, 2017.  Mr. Barham is further ordered to provide pre-judgment interest calculations in accordance with 28 U.S.C. § 1961 by October 23, 2017.  The Court will then consider the parties' filings and enter judgment by Friday, October 27, 2017.

SO ORDERED at Bridgeport, Connecticut, this 30th day of August, 2017.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE