## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MICHAEL BARHAM,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Civil Action No.: 3:12-cv-01361 (VAB)** |
| **v.** | : | |
| | : | |
| **WAL-MART STORES, INC. and** | : | |
| **WAL-MART STORES EAST, L.P.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR ATTORNEY'S FEES AND COSTS

I.     PRELIMINARY  STATEMENT

The plaintiff, Michael Barham, was employed by the defendants, Wal-Mart Stores, Inc. and Wal-Mart Stores East, L.P. ("the company" or "Walmart") for approximately ten years before his employment was terminated on April 9, 2010. He filed a race discrimination and retaliation complaint (both with respect to his termination and with respect to Walmart's refusal to rehire him) with the Connecticut Commission on Human Rights and Opportunities (CHRO) on August 6, 2010.  He filed a second complaint with the CHRO alleging racial discrimination and retaliation for failure to rehire him for additional jobs for which he applied on August 9, 2011. The plaintiff filed a consolidated complaint on September 21, 2012, 12-cv-01361, alongside plaintiffs Kim Hannah and Tom Irving, raising all the same claims, but with respect to the different jobs that they occupied and applied for, based on the CHRO right-to-sue notice they received for their 2010 CHRO

complaint.

After a right to sue notice was provided from the CHRO for the second (amended complaint) concerning plaintiffs Hannah's and Barham's additional rehire claims, the plaintiffs filed a complaint, 14-cv-1808, based on that second right-to-sue notice from the CHRO and then moved to consolidate 14-cv-1808 into the previously pending 12-cv-01361. The defense opposed consolidation, arguing that the new rehiring claims were merely continuing violation claims and therefore should be admitted into evidence in the already pending case[1]. Judge Hall rejected the defense's opposition to consolidate the two cases and ordered both cases consolidated into the 12-cv-01361 case.  Even with respect to the 2014 action, the defense did not amend its Rule 26 disclosures to include approximately ten witnesses who it later in 2016 claimed were decision-makers with respect to the rehiring decisions and which it claimed should be permitted as witnesses.

The defense filed a motion to sever the three cases, which was denied by Judge Bolden.  The defense then filed a motion to reconsider that denial, which was also denied by Judge Bolden on June 2, 2016.

The defense filed a motion for summary judgment regarding four claims:  (1)—the racially discriminatory termination,  (2) the retaliatory termination; (3) the discriminatory failure to rehire; and (4) the retaliatory failure to rehire. **Judge Bolden denied the**

---

[1] The defense thereafter pursued contradictory arguments and proliferated the pleadings unnecessarily. The defense later claimed, in contradiction to this continuing violation theory, both (1) in a motion in limine that these "continuing violations" in 2011-2014 should not be admitted in evidence, and (2) in their motion for summary judgment that these subsequent incidents of retaliation/discrimination should be dismissed because they were not entitled to a "temporal proximity" inference.  Of course, the continuing violation theory that it claimed applied (in its opposition to consolidation) makes clear that all the retaliation is part of the same ongoing retaliatory animus as the earlier incidents, thereby making both its arguments in limine and on summary judgment, at best, hypocritical.

defendant's motion for summary judgment with respect to three of the four grounds on

June 2, 2016 (ECF 295), but granted summary judgment with respect to the claim for

retaliatory termination.[2]

      The defense filed multiple motions in limine.  The defense, for instance, filed a

motion in limine regarding punitive damages, claiming that no reasonable jury could find

punitive damages.  The Court properly denied this motion. (Indeed, the jury ultimately

awarded perhaps the highest punitive damages award in the history of the state of

Connecticut for retaliatory failure to rehire).  The defense filed a motion in limine to

exclude all evidence of later applications for rehire that had been dismissed (even though it

had previously argued in objecting to the motion to consolidate that these were all

admissible as continuing violations), and even though these applications were relevant to

---

[2] However, because Barham had applied to three jobs during the interregnum between the date he was notified of his termination (January 29, 2010) and his last day of work (April 9, 2010), and Stan Golembewski was hired with lower qualifications, for Barham's job at a higher base salary, the loss on summary judgment on the retaliatory discharge claim would have had no effect on Barham's level of damages he could  recover, given that he would have had uninterrupted employment had he been hired back to his former position before April 2009.  Barham could receive the same damages for his termination, as for his failure to be rehired claims, because three of his failure to rehire claims would have provided him with uninterrupted employment.

      The defense never moved for summary judgment on Barham's retaliatory failure to rehire claims in relation to his February-April 2010 applications for three MAPM jobs in New Haven, Waterford and Mohegan Lake, and those three positions remained at issue in the case, and were presented to the jury.  Therefore, the narrow summary judgment win would have not had any effect on damages, were it not for misleading statements that the defense made to the Court in 2016 –promptly, consistently and regularly rebutted by Barham —that the earliest application at issue was the February 2011 application for a MAPM position into which Tiffany Vendetti was hired.  As a consequence of that misrepresentation to the Court, the jury instructions were amended and changed at the last moment, on the day they were provided to the jury, to exclude the 2010 applications from the retaliatory failure to rehire claims.  The jury verdict form was general, in contrast, and referred generally to a finding of retaliation, without specifying which jobs the jury found involved retaliation.

mitigation issues and punitive damages.  The defense also lost that motion in limine.

This case was tried to a jury from February 28, 2017 through March 8, 2017.  The defense brought a motion for a directed verdict, which was denied. The jury returned a verdict on March 8, 2017 in favor of the plaintiff on his claim of retaliation for failure to rehire. The jury verdict form made a general finding of retaliatory failure to rehire, without specifying which positions. The jury awarded non-economic damages of $550,000 and punitive damages of $5,000,000. ECF 430.

The defense moved to remit the combined punitive and non-economic damages to below the $300,000 cap.  The plaintiff did not oppose the remittitur to the $300,000 cap, but argued that the proof in the case was sufficient to award the maximum $300,000 in combined punitive damages and noneconomic damages.  The Court agreed with plaintiff, denied the defense motion to remit below the statutory cap, and issued a remittitur decision permitting the maximum combined cap of $300,000.

In accordance with the request made by the defendant, the issue of back pay and front pay  was not submitted to the jury but was instead reserved for decision by the Court, resulting in another separate trial. The Court conducted an evidentiary hearing on that issue on May 30, 2017.  On August 30, 2017, the Court awarded the plaintiff $238,678 plus prejudgment interest for economic damages through October 23, 2017, and ordered the defendant to reinstate the plaintiff to his former position.

II.     THE LODESTAR ANALYSIS

As the prevailing party in this action, the plaintiff is entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988; 42 U.S.C. § 2000e-5(k); and Federal Rule of civil Procedure 54)(d) (for costs). In civil rights litigation, plaintiffs are considered "prevailing"

if "they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).

In Perdue v. Kenny A. ex. rel. Winn, 559 U.S. 542, 130 S. Ct. 1662 (2010), the United States Supreme Court examined the interpretation and calculation of attorneys' fees under "federal fee-shifting statutes" that calculate awards using the "lodestar" method. The Court noted the similarity of all fee-shifting statutes, and laid out the "important rules" for calculating a "reasonable" fee under them. *Id.* at 1671 n.3, 1672- 1673. Specifically:

- A "reasonable fee" must be sufficient to "induce a capable attorney to undertake the representation of a meritorious" case. *Id.* at 1672;

- The "lodestar" method for determining a fee is "presumptively sufficient to achieve this objective," as a properly calculated lodestar includes "most, if not all, of the relevant factors constituting a 'reasonable attorney's fee.'" *Id.* at 1673.

- The relevant factors for calculating the lodestar include, but are not limited to: the novelty and complexity of the litigation, the skill and experience of the attorney, the overall quality of the representation, and the understanding that payment of fees will generally not come until the end of the case, if at all. *Id.* at 1673, 1675;

- A lodestar-based fee can be "enhanced" in "exceptional" circumstances that the lodestar "did not adequately take into account." *Id.* at 1669, 1673.

In *Rinaldi v. Laird*, 2017 WL 2616921 (D. Ct., June 16, 2017) the court held that a prevailing party in a civil rights lawsuit "should ordinarily recover an attorney's fees unless

special circumstances would render such an award unjust." (*Citing Lefemine v. Wideman*, 133 S. Ct. 9, 11 (2012) (*per curiam*). The Court must determine a presumptively reasonable fee, based on a reasonable hourly rate and the number of reasonably expended hours. *See, e.g.*, *Bergerson v. New York State Office of Mental Health, Cent. New York Psychiatric Ctr.*, 652 F.3d 277, 289–90 (2d Cir. 2011). To determine the reasonable number of hours and whether the requested compensable hours should be subject to reduction, the Court also considers "the degree of success obtained by the plaintiff," *Barfield v. New York City Health & Hospitals Corp.*, 537 F.3d 132, 152 (2d Cir. 2008) (internal quotation marks and citation omitted), as well as the following factors:

> (1) the time and labor required;
>
> (2) the novelty and difficulty of the questions;
>
> (3) the skill requisite to perform the legal service properly;
>
> (4) the preclusion of other employment by the attorney due to acceptance of the case;
>
> (5) the customary fee;
>
> (6) whether the fee is fixed or contingent;
>
> (7) time limitations imposed by the client or the circumstances;
>
> (8) the amount involved and the results obtained;
>
> (9) the experience, reputation and ability of the attorneys;
>
> (10) the "undesirability" of the case;
>
> (11) the nature and length of the professional relationship with the client; and
>
> (12) awards in similar cases.

*U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 415 (2d Cir. 1989); *see also Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany and Albany County Bd. of*

*Elections*, 522 F.3d 182, 186 n.3, 190 (2d Cir. 2008) (same).

The Supreme Court made clear that these rules apply generally to "federal fee shifting statutes," like Title VII, that are "based on the 'lodestar,' i.e., the number of hours worked multiplied by the prevailing hourly rates...." <u>Perdue,</u> 130 S. Ct. at 1669. This Court has noted that "[i]n determining an appropriate fee award, both the Second Circuit and the Supreme Court 'have held that the lodestar - the product of a reasonable rate and the reasonable number of hours required by the case - creates a presumptively reasonable fee.'" *Castelluccio v. IBM*, 2014 U.S. Dist. LEXIS 100057, *3, 2014 WL 3696371 (D. Conn. July 23, 2014), *quoting Milea v. Metro-North R. Co.,* 658 F.3d 154, 166 (2d Cir. 2011). The Court "should generally use 'the hourly rates employed in the district in which the reviewing court sits' in calculating the presumptively reasonable fee." *Munoz v. Manhattan Club Timeshare Ass'n,* 2014 U.S. Dist. LEXIS 132166, *8 (S.D.N.Y. Sept. 18, 2014); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty of Albany.* 493 F.3d 110, 119 (2d Cir. 2007). "Reasonable hourly rates 'are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" *Valley Hous. Ltd. P'Ship v. City of Derby,* 2012 U.S. Dist. LEXIS 45246, *6 (D. Conn. 2012), *quoting Blum v. Stenson,* 465 U.S. 886, 895 (1984).

This Court has described the process for determining an award of fees as "really a four-step one, as the court must: (1) determine the reasonable hourly rate; (2) determine the number of hours reasonably expended; (3) multiply the two to calculate the presumptively reasonable fee; and (4) make any appropriate adjustments to arrive at the final fee award." *Valley Hous. Ltd. P'ship,* 2012 U.S. Dist. LEXIS at *6, *quoting Adorno v. Port Authority of New York and New Jersey*, 685 F. Supp. 2d 507, 513 (S.D.N.Y. 2010).

The Supreme Court has recognized that where a civil rights suit involves multiple claims "involv[ing] a common core of facts... [m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis," and that "[s]uch a lawsuit cannot be viewed as a series of discrete claims." *Hensley,* 461 U.S. at 435.  The Supreme Court has therefore instructed district courts to "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* To that end, "[t]he Supreme court has provided that 'the most critical factor' in determining the reasonableness of a fee award is the degree of the success obtained." *Chopra v. GE,* 527 F. Supp. 2d 230, 252 (D. Conn. 2007), *citing Farrar v. Hobby,* 506 U.S. 103, 114 (1992); *See, LeBlanc-Sternberg v. Fletcher,* 143 F.3d 748, 762 (2d Cir. 1998) ("When a plaintiff has achieved substantial success in the litigation but has prevailed on fewer than all of his claims, the most important question in determining a reasonable fee is whether the failed claim was intertwined with the claims on which he succeeded.")

This Court has held that "[i]n order to recover on the entire fee incurred on both successful and unsuccessful causes of action, the claims must be "inextricably intertwined" and involve a common basis in fact or legal theory. *Chopra,* 527 F. Supp. 2d at 251-252, *citing Reed v. A.W. Lawrence & Co, Inc.,* 95 F.3d 1170, 1183 (2d Cir. 1996). "Where the district court determines that the successful and unsuccessful claims are 'inextricably intertwined' and 'involve a common core of facts or [are] based on related legal theories,' it is not an abuse of discretion for the court to award the entire fee." *Reed,* 95 F.3d at 1183, *quoting Dominic v. Consolidated Edison of New York, Co.,* 822 F.2d 1249, 1259 (2d Cir. 1987). *See also, Hensley,* 461 U.S. at 435.

In *Chopra,* the plaintiff won his claim that the defendant had retaliated against him for complaining about wrongful discrimination based on race, national origin, and age. However, "[t]he Court granted summary judgment on plaintiff's claims of promissory estoppel, negligent misrepresentation, discrimination, and negligent infliction of emotional distress" and the jury did not find for the plaintiff on his claim of retaliation based on FMLA activity. *Chopra,* 527 F. Supp. 2d at 252. The Court concluded that the "negligent misrepresentation and promissory estoppel claims are unrelated to the adverse employment action." The Court further held that "[t]he FMLA claim is distinguishable from the other [successful] retaliation claims, which evolved from plaintiff's complaints of discrimination." *Id.* Based on those findings, the Court reduced the fee amount "by 10% for work related to negligent misrepresentation and promissory estoppel, and 10% for the FMLA claim." *Id.* However, the Court did not reduce the fee award with respect to the "unsuccessful" discrimination claim because it was "inextricably intertwined" with the successful retaliation claim. Rather, theCourt made an upward adjustment on the remaining attorneys' fees, including added fees in relation to post-trial motions, "to reflect the 'results obtained' on the claims submitted to the jury." *Id.*

As the Second Circuit has explained, because the Supreme Court has said that the district court "should focus on the overall relief obtained by the plaintiff in relation to the hours expended on the litigation," where "the factual and legal theories underlying [plaintiff's'] [] discrimination claim [are] inextricably intertwined with those underlying [her] retaliatory discharge claims," and the plaintiff recovers essentially the same relief on the retaliation claim as she would have on the discrimination claim, an award of the full lodestar amount, without any reduction for time spent on the unsuccessful discrimination

claim, is justified. *Dominci,* 822 F.2d at 1259-60, *quoting Hensley,* 461 U.S. at 435.

Ill.     ARGUMENT

    A.     Background

       As set forth in the attached Declaration of Kristan Peters-Hamlin (attached hereto as Exhibit A), the plaintiff seeks attorneys' fees for 2,240.20 hours of work from February 2010 through October 23, 2017. Under the plaintiff's signed 2010 engagement letter with plaintiff's counsel, the fees to be paid are $650/hour.  The plaintiff has a contingency agreement.  However, under the clear terms of the agreement, if for any reason the plaintiff's counsel had to withdraw (*e.g,* if the plaintiff refused to cooperate in discovery) or was fired, plaintiff's counsel would have a lien on whatever Barham received as an award, in the amount hours expended multiplied by $650/hour, which is the plaintiff's counsel's standard rate. At the conclusion of the case, counsel and Mr. Barham split everything, both the attorney's fees and any other award, with the majority of the attorney's fees therefore going to Mr. Barham. Under this agreement, 2,240.20 hours multiplied by $650/hour would be $1,456,130, which would be the lodestar amount. However, counsel recognizes that recent cases have awarded more in the range of $500-$575 for attorneys with comparable 30 years of experience.  Given Mr. Barham's claim to most of these fees, it is difficult to waive the actual agreed rate, because it does not merely affect the undersigned. The undersigned has proposed herein that the parties attempt to either come to an agreement on the appropriate rate, or failing that, submit the rate determination to a mediator such as Joseph Garrison, who has substantial experience and knowledge concerning market rates for employment attorneys in Connecticut.

A total of 2581.1 hours were expended in representing the plaintiff in this litigation, by counsel, since counsel started representing Mr. Barham in February 2010.  From those hours, 340.9 hours have been deducted from the total and "no charged" because the time was considered unrelated to the success in producing the Barham verdict.

The case was vigorously litigated from the outset.  The defense made two motions to delay answering and numerous motions to delay discovery, and were finally ordered by Magistrate Fitzsimmons to delay no more. The defense refused to produce documents, requiring motions practice. After delays in producing evidence and disclosing witnesses, the defense then moved to limit the number of depositions the plaintiffs could take, and years after discovery was closed, revealed ten critical decision-makers in rehiring decisions on what they believed would be the eve of the autumn 2016 trial, while plaintiff's counsel was embroiled in trying a two-month long case. The defense's unfair discovery conduct, and violations of its Rule 26 and Rule 37 obligations, resulted in more motions practice.

A large percentage of the depositions the plaintiff was required to take were out-of-state, adding to travel time and expense.  The defendants refused to produce out-of-state witnesses in Connecticut, causing counsel to have to spend time and money to travel around the country to take such depositions.  Indeed, some employees were given new assignments by Walmart before their depositions in different, more distant states, causing counsel to have to travel to Alabama, Pennsylvania, New Jersey and Arkansas to take necessary depositions.

The defendant unsuccessfully moved for summary judgment on both the plaintiff's discriminatory failure to rehire, retaliatory failure to rehire, and discriminatory discharge

claims. Judge Garfinkel conducted at least three settlement conferences. There were

numerous pre-trial motions, seven full days of trial encompassing numerous witnesses,

approximately eighty-three plaintiff's and twenty-three defense exhibits, various post-trial

motions and briefing, and an evidentiary hearing held by Judge Bolden on the issues of

economic damages, including both front and back pay.

      B.     <u>The Rates Requested by the Plaintiff's Counsel Are Reasonable</u>

For the reasons set forth in plaintiff's counsel's declaration (hereafter, KPH

Declaration), the following hourly rates for plaintiff's counsel are reasonable: Kristan Peters-

Hamlin, $650/hour.  This is the contractual amount specified in the 2010 engagement letter

with Mr. Barham.  $650 is the standard rate that plaintiff's counsel charges for other

employment cases. This is the value that clients place on my services, which is a

determinative consideration.  *Heng Chan v. Sung Yue Tung Corp., 2007 WL 1373118*

(S.D.N.Y, Sept. 16 2007)(Gerard Lynch*)* (" if the measure is the market rate, what matters is

the value placed on lawyers' services by clients in the market"( (quoting Moon v. Kwon, 99-

cv-11810, 2002 WL 31512816 at *2 (SDNY Nov. 8, 2002).  Counsel has previously

submitted to the Court three letters from clients whom the undersigned has represented in

2015-2016 who have informed the Court that they paid $650 or more for the services of the

undersigned. Counsel has practiced law for more than thirty years and has considerable

experience and ability in the specialized area of employment law, and the rates charged are

consistent with those prevailing in this district for similar services by lawyers of reasonably

comparable skill and experience.  *See* Declaration of Kristan Peters-Hamlin.  My rate of

$650 is lower than it was ten years ago, when I was an equity partner at a large international

law firm, on the employment defense side.  Even a Connecticut attorney (John R. Williams)

who does not consider himself an employment law expert, but has a specialty in criminal

law and police brutality cases instead, has twice been awarded $500/hour in attorney's fees for handling employment law cases.  *See e.g., Muhammed v. Martocchio*, 2010 WL 3718560 at *4 (D. CT. 2010); *see also Rinaldi v. Laird*, 2017 WL 2616921 (D. CT June 16, 2017).  Gregg Adler also submitted a request for attorney's fees at the rate of $500/hour.  As Judge Gerard Lynch said ten years ago (and attorney fee rates have increased significantly over that time period), even the attorney who, in that case, had only half my years of experience (he had practiced sixteen years, I have practiced thirty years) and was not specialized in employment law, was entitled to a $450/hour rate.

Unlike Messrs. Adler and Williams, my office and practice is located in Fairfield County, and a lot of my clients are executives in the financial industry, such as hedge funds, private equity companies and investment banks, which can increasingly be found in Fairfield Country, but not in Hartford or New Haven. KPH Declaration.  Many such executives are accustomed to paying New York rates.  For that reason (and also owing to Fairfield County's proximity to New York), in my experience and observation, Fairfield County rates tend to be higher than the rates in Hartford and New Haven.  This district court is located in Fairfield County (not New Haven County or Hartford County) and therefore the higher rates in Fairfield County should apply.  Despite that, my $650/hour rate is approximately $100/hour lower than it was ten years ago when I was a partner at a large law firm.

However, in order to avoid burdening the Court with protracted analysis and accounting issues, the undersigned is willing to try to stipulate to a compromise lower rate

with defense counsel, or failing that, to submit to mediation before a neutral mediator with significant experience on attorney's fees, such as Joseph Garrison[3].

As Justice Brennan indicated in *Hensley*, having plaintiff's counsel have to be unduly burdened with defending their attorney's fees and having courts engaged in protracted analysis of attorney's fees "would be an anomalous result for judicial construction of a statute enacted "to attract competent counsel in cases involving civil and constitutional rights." *Hensley*, 461 U.S. at 456 (*citing* House Report 9; cf. Copeland v. Marshall, 205 U.S.App.D.C., at 400, 641 F.2d, at 890 (fee awards intended to provide "an incentive to competent lawyers to undertake Title VII work).

This case was particularly complicated because the plaintiff applied for dozens of jobs over many years. The undersigned has been unable to find another case involving the number of rejected job applications involved in this retaliation case. Tracking down the decision-makers on all those retaliatory failures to rehire, and getting discovery on them, was particularly challenging.  The Court will recall that the 30(b)(6) witness, Sharon Williams, testified that the persons listed on the requisition spreadsheets are not necessarily the decisionmakers, and she could not testify who the actual decisionmakers were.  Indeed, Walmart produced surprise decisionmakers for the first time in late 2016, years after discovery concluded, and plaintiff had to cross-examine them at trial without the benefit of having taken their depositions.  The in-court cross-examination trial skills I had developed trying cases every day in the busiest U.S. Attorney's office in the nation was very important for that peculiar challenge, in which Walmart

---

[3] In *Vera v. Alstom*, Mr. Garrison submitted an affidavit on behalf of Mr. Adler, attesting that $500/ hour was a reasonable rate for Mr. Adler.  I first worked with Mr. Garrison in about 2002 or 2003 in a mediation when I was an equity partner at Pillsbury Winthrop, and the head of its Stamford office's Employment Law Department.  I reached out to him to submit a similar affidavit about a reasonable rate for me.  However, Mr. Garrison's assistant informed me that he has been out of the country for more than a month on vacation in Tanzania and other parts of Africa, and will not be back until October.

repeatedly violated Rules 26 and 37 and failed to disclose key decisionmaker witnesses, until years after discovery closed.[4]

It took an enormous amount of work over nearly eight years for this small firm to pursue the dozens of applications  and dozens of instances of retaliation over many years against the resources of the world's largest company, and a firm with 1300 labor and employment attorneys in 75 offices, and to not only prevail, but break records in this state for a punitive damages award in a single plaintiff retaliation case.

In determining the value of the presumptively reasonable fee, the Second Circuit explained,

> the district court should, in determining what a reasonable, paying client would be willing to pay, consider factors including, but not limited to, the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), **the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics),** the timing demands of the case, whether the attorney had an interest (independent of that of his client) in achieving the ends of the litigation or initiated the representation himself, whether the attorney was initially acting pro bono (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) the attorney expected from the representation.
>
> *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 484F.3d 162,

(2d Cir. Apr. 24, 2007)(emphasis added).

As Judge Lynch reflected in *Hang Chan,* "In this case, most of these factors point to a relatively high award of fees. The case was unusually difficult and complex, the resources required to prosecute it immense." 2007 WL 1373188 at *2.  For a firm of my firm's size, diverting nearly eight years to this matter, paying for depositions without the chance of never

---

[4] With a few exceptions, it is my observation that it is rare for former Assistant United States Attorneys to go into employment law when they leave the Office.  Most continue to specialize in criminal law or corporate governance when they leave the Office.

being reimbursed from unemployed/under-employed clients, pursuing dozens of applications and dozens of counts of retaliatory failure to rehire consumed thousands of hours.  I was forced to turn away other business because of the time required for my small firm to prosecute a case of this size against the world's largest company who refused to produce most witnesses in Connecticut, requiring me to expend money on flights, travel and hotels.

Defense counsel telegraphed to Magistrate Garfinkel that he plans to use this opportunity regarding the proper attorney fee rate to make further ad hominem attacks against me, assailing, for the umpteenth time, my reputation because I was sanctioned and disciplined in relation to a case that was pending before judge Baer, very briefly, ten years ago for an alleged failure to obey two orders.  *See In re Peters,* 642 F. 3d 381 (2d Cir. 2011)(defining the alleged charges as violating two orders and remanding the case, after vacating all discipline).  "Reputation" is only one consideration of about a dozen such consideration in the typical lodestar analysis, and there is no evidence that my reputation has been hurt with *my clients*, who continue to use me and to recommend me.  The underlying case involves merely one instance, in a thirty-year career, with reciprocal decisions thereafter. As the Court knows, courts making reciprocal disciplinary decisions do not normally revisit the underlying facts, but instead accept the facts as originally found, and consider instead what discipline to impose. There was a range of such reciprocal decisions thereafter about the same case.[5]

---

[5] Defense counsel has already littered this docket with many of them from foreign jurisdictions, in a clear effort to prejudice this Court.  To that end, and in an effort to disparage me and to prejudice this Court, Mr. Dickinson has associated himself with, and worked with, a Francis Carling, who was terminated from his former firm for trying to get paid on the side by not just one client, but two.  The present Chair of the New York Bar, Ernest Collazo, testified that Mr. Carling was unethical, extortive, and untruthful. Ex. C.  Despite bringing this to Mr. Dickinson's attention, he still has chosen to affiliate and associate himself with Mr. Carling in this effort to disparage me.  The Court is well aware of this ten-year old matter and its reciprocal consequences, as I produced a letter on this issue to the Court myself, outlining the reciprocal matters.  Mr. Dickinson's continuous effort to dredge up this matter is therefore clearly not for

Here in Connecticut, however, where this *Barham* case has been pending and where my offices are located, the state bar imposed no suspension, nor did the bar of the Second Circuit. This Court imposed a suspension *nunc pro tunc*, which expired three days after I was notified of it. Notably, the underlying discipline had nothing to do with trial skills, writing skills, knowledge of employment discrimination law, legal ability and there was no allegation in that case, or any case that I have ever worked on, that I have ever hurt, betrayed the interest of, or disappointed a client. Indeed, the Court is in possession of numerous letters from clients praising my abilities, my dedication, and my humanity. While the case certainly was painful, it has not stopped clients from seeking me out, paying my fees, nor has it stopped me from winning cases for my clients, and serving their interests ably.  That ten-year old case does not speak to my skills, ability or experience.  The issue has been played out by defense counsel, not only to the point of exhaustion, but with the same bullying edge that he displayed when the jury observed defense counsel bullying Mr. Barham on the stand about whether he had ever taken college courses, or merely had a high school degree.  Such bullying is unbecoming, and should stop.

      C.    <u>The Plaintiff's Fee Request Reflects a Reasonable Number of Hours</u>

As described in Attorney Peters-Hamlin's declaration, and detailed in the contemporaneous billing records attached thereto, the total number of hours expended on this case is reasonable.  Comparisons to recent cases are illuminating.  For instance, in *Vera v. Alstom*, a case that had only approximately one-third of the docket entries that are in this case, the attorneys expended 1,235.45 hours.  *See Vera v. Alstom*, 3:12-cv-00382 (D. Ct. 2016) (declaration of Gregg Adler at p, 6, fn. 2 at ECF 185-2).  This

---

informative purposes, but intended instead for the purpose of prejudice this Court against me. Given that my client (who is innocent and) who would be the beneficiary of most of the attorney's fees awarded, it is respectfully submitted that the Court should reject defense counsel's unseemly effort to inject prejudice into this decision on attorney's fees.

Memorandum, in contrast, would be filed at ECF 632, and the declaration of Kristan

Peters-Hamlin would be filed at ECF 633, which is more than three times more

pleadings filed in this case[6] than in the V*era v. Alstom* case, in large part owing to

Walmart's scorched earth approach to this litigation, the numbers of motions it filed, as

well as the sheer volume of applications for rehire in this case, involving dozens of

instances of retaliation.  The hours expended in this case for three times the amount of

docket entries as in the Vera v. Alstom case is 2,240.20 hours, which is only about 1.8

times the 1,235.45 hours expended by Vera's plaintiff's counsel for a single plaintiff

case.

These dozens of instances of retaliation against Barham caused the case to be

more complicated, discovery-intensive, and also undoubtedly lead the jury to render

such a high punitive damages award, because these dozens of instances made

abundantly clear to the jury the retaliatory animus of Walmart.   This case not only

involves more than three times the docket entries than that of the *Alstom* case, but it also

took two years longer to finish discovery, finish briefing and proceed to trial, even

though CHRO claims were filed in both the *Barham* and the *Vera* cases in 2010, and

both the *Barham* and the *Vera* cases were filed in this Court in 2012.  Additionally, in

this case, many instances/allegations of denied applications to rehire and retaliation were

added later, in a subsequent, consolidated case, including the application for the Tiffany

Vendetti MAPM position, for which the Court ultimately ordered an award of economic

damages.

---

[6] That number does not include the filings at 14-cv-1808, the case consolidated with this 12-cv-1361 case.

Plaintiff's counsel has already exercised reasonable billing judgment by not charging for time that was not reasonably recoverable.  340.9 hours were deducted from the 2017 bill, as I did not believe they contributed to the success of the Barham verdict, or to this Court's decision.

Notwithstanding the vigorous defenses put forth by the world's largest company and the world's largest employment law defense firm, by nearly all measures the plaintiff prevailed in this litigation. The jury issued a verdict in favor of the plaintiff on his retaliation claim that broke state records for a punitive damages award. The Court upheld the maximum combined punitive/noneconomic damages award within the statutory cap, finding that the evidence of Walmart's misconduct and willfulness was substantial and the evidence was significant of personal suffering by Mr. Barham in losing custody of his baby son, and being forced to move hours from his family. The jury further concluded that the plaintiff had successfully proven that both compensatory damages and punitive damages were warranted, and it awarded substantial sums for each. The Court then awarded Barham economic damages and it ordered the defendants to reinstate the plaintiff to his position. In short, the plaintiff succeeded in proving every aspect of his retaliatory failure to rehire claim.  Had it not been for the defense's misrepresentation about what was dismissed from the case (the defense failed even to move to dismiss the 2010 applications, but then misrepresented to the Court that they had been dismissed from the case), and the last-minute change to the jury instructions, the plaintiff would have also been compensated for all his lost salary, benefits and seniority rights from April 9, 2010, as well.  This would have put him in the precise position from a damages perspective as if he had also prevailed on his discharge claim.

Plaintiff does recognize that the defendant will argue that the fee award should be reduced because the plaintiff did not prevail on all of his claims and that some of the fees relate to litigation involving two co-plaintiffs.  However, each co-plaintiff had the identical four claims of discriminatory and retaliatory discharge and failure to rehire claims, arising out of the same sham restructure and all three were African American market level managers, and the ***case law*** in the legal briefing was identical for all three.  There was a common core of facts, and related legal theories. All the evidence was inter-related and helpful to prove the rest of the case, and there was a tremendous amount of overlap between the plaintiffs' cases, producing economies on briefing and legal reasoning, given the identity of theories of retaliation.  Indeed, Judge Lynch cautioned that a court should not reduce a fee award, simply because some of the counts were not successful.  In *Heng Chan, supra,* Judge Lynch reasoned as follows:

> Defendants contend that the fee award should be reduced in light of the fact that plaintiffs did not prevail as against defendants Gong Gui Guan and former defendant Hang Li, the latter of whom was voluntarily dismissed after the conclusion of the trial. Where "the plaintiff's claims for relief ... involve a **common core of facts** or [are] **based on related legal theories**," it is "difficult to divide the hours expended on a claim-by-claim basis," and "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley,* 461 U.S. at 435. " '[T]he most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'"

*Heng Chan, supra, citing Farrar v. Hobby,* 506 U.S. 103, 114 (1992), *quoting Hensley*, 461 U.S. at 436 (emphasis added).

Moreover, in order to prevail on his retaliation claim, the plaintiff was required to prove that he had a good faith basis for bring a discrimination claim in the first place.

Therefore, he need to prove he had a good faith basis to bring a claim of discrimination, in

order to prevail on retaliation, and therefore the claims were inextricably intertwined. Indeed, even Barham's dismissed later applications were permitted to be presented in evidence and were in fact required to prove mitigation, punitive damages, absence of mistake, common scheme and plan, motive, etc.

Additionally, both Hannah and Irving were permitted to present testimony at Barham's trial and their permitted testimony was powerful.  Therefore, the attorney's fees associated with their depositions and discovery responses are also recoverable.

Even more importantly, retaliation against other employees is admissible to prove retaliation against the plaintiff. *See Sumner v. USPS,* 899 F.2d 203, 209 (2d Cir.1990).  In *Summer,* the Second Circuit held that a causal connection "can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory [or here, retaliatory] treatment **or through evidence of disparate treatment of employees who engaged in similar conduct**."  (Emphasis added).  Therefore, all the evidence of retaliatory conduct against Hannah and Irving was relevant to prove retaliation against Barham.  The effort to allege and prove Hannah's and Irving's discrimination and retaliation claims were therefore directly relevant to, and useful to prove, the claims of Barham. *Hamza v. Saks Fifth Avenue,* 2011 WL 6187078 (S.D.N.Y. 2011) ("evidence of disparate treatment of employees who engaged in similar conduct" is probative.)

Despite the fact that the Court did not ultimately allow in the *Barham* case all the evidence of similar acts of retaliatory failure to hire against Hannah and Irving, this is not dispositive. In Barham's case, the evidence was strong enough and the plaintiff's counsel's cross examination of the defense witnesses and the presentation of the case was sufficiently skilled that the plaintiff was able to prevail, even  though the Court did not

allow in some of Hannah's and Irving's evidence.  Nevertheless, nothing in the caselaw on attorney's fees permits a court to disallow attorney's fees for work reasonably related to proving a plaintiff's case by dotting every "i" and crossing every "t" to ensure the strongest case possible.  Since the case law makes clear that Hannah's and Irving's claims of similar retaliatory failure to rehire them (because they brought a lawsuit alongside Barham) is relevant evidence to Barham's claim of retaliation (*Sumner v. USPS,* 899 F.2d at 209) then all such evidence, elicited and developed for Hannah and Irving are relevant and the attorney's fees related to developing that evidence and supporting those claims are compensable.

It is beyond dispute that the evidence on the discrimination was inextricably intertwined with the evidence of retaliation, and indeed, is a *sine qua non* for proving retaliation. Thus, the fact that the plaintiff did not ultimately prevail on the racial discrimination claim should not result in any downward adjustment of the lodestar amount.

Accordingly, the Court should award the plaintiff $1, 456,130 for attorneys' fees through October 23, 2017, or no less than a rate of $500/hour awarded in cases for similarly experienced counsel, which would be $1,120,100.

    D.    <u>Costs</u>

It is undisputed that under both Title VII and Federal Rule of Civil Procedure 54(d), a prevailing plaintiff is entitled to recover all costs and expenses. After certain costs were deducted and not counted as part of the costs to be submitted in this case, the submitted costs and expenses incurred by the plaintiff totaling $36,500.77, and are listed in Attachment B to the Declaration of Kristan Peters-Hamlin.

IV.    CONCLUSION

For all of the foregoing reasons, the Court should award the plaintiff in the  range between $1,120,100 to $1,492,630.77 (if the parties' agreement is honored) for attorneys' fees, costs and expenses through October 23, 2017.

Respectfully submitted,
Plaintiff's Counsel
By:  /s/ *Kristan Peters-Hamlin*
Kristan Peters-Hamlin
Peters Hamlin LLC
37 North Ave., suite 201
Norwalk, CT, 06851
(203) 504-2050

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of September 2017, a copy of the foregoing was sent electronically to Counsel for the defense.

/s/ *Kristan Peters-Hamlin*