## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MICHAEL BARHAM,                          :
                                         :
                                         :
                    Plaintiffs,          :        CIVIL ACTION NO.:
                                         :        3:12-CV-01361 (VAB)
         v.                              :
                                         :
WAL-MART STORES, INC. and                :
WAL-MART STORES EAST, L.P.               :
                                         :        October 17, 2017
                    Defendants.          :
                                         :

## DEFENDANTS' OPPOSITION TO
## PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS

### I.    INTRODUCTION

Defendants Wal-Mart Stores East, L.P. and Wal-Mart Stores, Inc. (collectively "Walmart" or "Wal-Mart"), submit the following response to Plaintiff's Motion for Attorney's Fees and Costs. Plaintiff's motion grossly distorts the record and makes unsupported arguments yielding a highly inflated calculation of recoverable fees. The record is clear that three Plaintiffs filed two complaints that set forth a total of 34 claims; yet only one Plaintiff prevailed and only on 1 claim. In addition to the extremely limited level of success achieved in this litigation, the Court has already determined that the sole successful claim was not "inextricably linked" to the 33 unsuccessful claims. Finally, Plaintiff's counsel's suggested hourly rate is completely out of line with the market rates for attorneys performing similar work at issue, particularly in light of the quality of the work performed in this case and the disciplinary issues impacting counsel's marketability. For these reasons and those set forth in further detail below, Plaintiff's fee application must be substantially reduced, if not rejected outright.

## II.     RELEVANT FACTUAL BACKGROUND

Plaintiff's motion implies that he pursued this litigation independently and that he largely prevailed in that endeavor. The record makes clear that this is clear error. Mr. Barham pursued this litigation in conjunction with Kim Hannah and Tom Irving and collectively they prevailed on virtually none of their claims.

Plaintiff Kim Hannah ("Hannah") was hired on June 25, 2002. (Ruling on Motion for Summary Judgment, ECF no. 255 at p. 2) Over time, she came to hold the position of Market Human Resource Manager ("MHRM"), first in New York and then in Connecticut. (Id.). The Market Manager for the Connecticut Market area Hannah supported was Alan Nasson. (Id.).

Plaintiff Thomas Irving, Jr. ("Irving") was an African American male who was hired on April 15, 2006 as an MHRM in Connecticut.  The Market Manager for the Market area in Connecticut that Irving supported was Brian West. (ECF no. 255 at p. 3)

Plaintiff Michael Barham ("Barham") was hired on October 12, 2000.  Mr. Barham was eventually promoted to a Market Asset Protection Manager ("MAPM") position. (Id.).  The Market Manager for the Market area Barham supported in Connecticut was Kim Golembewski. (Id.).

During the second half of 2009 and into January 2010, Walmart developed and implemented a nationwide reorganization. (ECF no. 255 at p. 3).  That reorganization resulted in the complete restructuring and realignment of Market level positions. (Id. at p. 4).  In particular, some MHRM and MAPM positions were eliminated. (Id.).

Kim Hannah, Tom Irving and Michael Barham's positions were terminated in April 2010 as a result of the reorganization. (ECF no. 255 at p. 8).  Other than race and the process that lead to their respective terminations in April 2010, Barham's claims had nothing in common with Hannah's and Irving's claims.

Barham worked in a different Market than those supported by Hannah and Irving. He covered a different geographical area, he worked with a different Market Manager, and interacted with different Managers and Associates. (Ruling on Motion for Summary Judgment, ECF no. 255 at pp. 2-3). Of most import, Barham performed a completely different job than Hannah and Irving. Barham was a MAPM, who had responsibility for assisting his market's Store Managers with loss prevention and safety related issues. (Id.). Hannah and Irving were MHRMs, who were responsible for assisting their respective market's Store Managers with staffing, discipline and other human resources related issues. (Id.).

Barham also had a completely different reporting structure from Hannah and Irving. At the time of the reorganization, Barham reported to Regional Asset Protection Manager Brian Broadus, who in turn reported to Divisional Asset Protection Manager Anthony Restuccia. (Ruling on Motion for Summary Judgment, ECF no. 255 at p. 2). In contrast, Hannah and Irving reported to Regional Human Resources Manager Baldomero Silva, III, who in turn reported to Divisional Human Resources Manager Phil Morris. (Id.).

Consistent with the fact that they performed entirely different jobs and functioned in distinct reporting structures, the decision to eliminate Plaintiffs from their respective positions was executed by different people under difference circumstances. (Ruling on Motion for Summary Judgment, ECF no. 255 at p. 7). While the Plaintiffs worked for the same company and were terminated on the same date, their claims were clearly not inextricably intertwined. The procedural history of the case underscores this conclusion.

## III.    RELEVANT PROCEDURAL BACKGROUND

Following their terminations, each Plaintiff filed dual administrative charges with the CHRO and the EEOC on August 27, 2010. Each Plaintiff filed a separate charge alleging

discrimination and retaliation in connection with their termination and failure to be rehired. The CHRO issued Releases of Jurisdiction to each of the Plaintiffs on April 10, 2012. The EEOC issued Right to Sue letters to each of the Plaintiffs on June 19, 2012.

Plaintiffs filed this joint lawsuit in the United States District Court, District of Connecticut on September 21, 2012. (ECF no. 1)  Plaintiffs alleged discrimination and retaliation in connection with their respective terminations and respective failures to be rehired. Plaintiffs filed an Amended Complaint on October 15, 2012. (ECF no. 6). Walmart filed its Answer in December 2012. (ECF no. 16). At this time, Plaintiffs had a total of 24 pending state and federal claims – 9 for Hannah, 9 for Irving and 6 for Barham. (ECF no. 6).

The parties engaged in an unsuccessful settlement conference on April 1, 2013. (Id. at ECF no. 29). On April 12, 2013, Walmart filed a motion for partial judgment on the pleadings because Plaintiffs failed to serve their state law claims in a timely fashion. (ECF no. 30). Judge Hall granted that motion in its entirety on August 30, 2013. (ECF no. 79.)  As a result, all of Plaintiffs' state law claims were dismissed and the 42 U.S.C. §1981a damage caps became effective. In the wake of that dismissal, Plaintiffs total pending federal claims dropped from 24 to 11 – 4 for Hannah, 4 for Irving and 3 for Barham. (ECF nos. 30 and 79.).

The parties engaged in extensive and often contentious discovery throughout this matter. There were several motions to compel and for protective orders (i.e., three Motions to Compel the Plaintiffs to respond to written discovery and a Motion for Protective Order to block Plaintiffs' effort to force remote witnesses to appear for depositions in Connecticut and to limit the number of depositions taken by the Plaintiffs). The overwhelming majority of those disputes

were resolved in Walmart's favor.  (*See e.g.*, ECF nos. 46, 61, 64, 75, 84, 87, 118, 120, 127, 130, 153, 154, 160, 161, 162, 163, 169, 176, 178).[1]

In an effort to circumvent the dismissal of their state law claims, Plaintiffs filed another round of administrative charges followed by another Complaint on December 2, 2014 ("14-cv-1808").  This raised Plaintiffs' total pending state and federal claims to 21 – 8 for Hannah, 6 for Irving and 7 for Barham.

On February 6, 2014, Wal-Mart filed a Rule 12(b) motion to dismiss 14-cv-1808 in part because Plaintiffs' state law claims were again untimely.  The court consolidated 14-cv-1808 with the instant action. (ECF no. 240)  On June 17, 2015, the court again dismissed Plaintiffs' second set of state law claims as untimely. (ECF no. 241)  In reaching that conclusion, Judge Hall noted: "The court also notes that plaintiffs *were clearly aware of this requirement*. In addition to being represented by experienced counsel, *the court's prior Ruling* in Case No. 3:13-cv-01361 (VAB) *clearly articulated that, in order for a claim to be 'brought' for the purposes of CFEPA's 90-day requirement, the defendant must be served with the complaint.*" (14-cv-01808 ECF no. 29 at p. 7)(emphasis added).[2]  As a result of the dismissal of the Plaintiffs' second round of state law claims, the §1981a damage caps remained in place.  At this juncture, Plaintiffs' total pending claims dropped back down to 11 – 4 for Hannah, 4 for Irving and 3 for Barham.

---

[1] In addition to inflating docket entries through unnecessarily contentious discovery and related motion practice, Plaintiffs' counsel also drove the docket entry count up through dozens of requests for extensions of time, as well as filing drafts and corrected versions of various motions and other submissions.

[2] Plaintiffs' counsel claims that defense counsel have engaged in *ad hominem* attacks on her. The record reveals that the opposite is true. In response to one of Plaintiffs' counsel's early *ad hominem* assaults on defense counsel, Judge Hall also noted: "The court is also perplexed by plaintiffs' argument that defense counsel 'was obviously simply involved in gamesmanship' and engaged in 'effort[s] to trick counsel into sending him service by hardcopy in the mail seeking a written waiver.'. . .  In a December 3, 2014 email sent in response to the email sent by plaintiffs' counsel, defendants' counsel explicitly informed plaintiffs' counsel that, 'I cannot represent to you that I am representing Walmart in this newly filed matter.  You will need to effect service in the ordinary course.'. . . Nothing about this statement could be construed as misleading plaintiffs' counsel as to the need for service of process – if anything, it did the opposite." (14-cv-01808 ECF no. 29 at pp. 7-8)(citations omitted).

On January 12, 2015, Wal-Mart filed a motion for summary judgment. (ECF no. 205). On February 11, 2016, Wal-Mart's motion for summary judgment was granted in part. (ECF no. 255). At this juncture, Plaintiffs' total pending claims dropped from 11 to 5 – 1 for Hannah, 1 for Irving and 3 for Barham.

On March 3, 2016, Wal-Mart filed a motion for reconsideration. (ECF no. 271)  On June 2, 2016, Wal-Mart's motion for reconsideration was granted in part and denied in part. (ECF no. 295).[3]  The decision on the motion for reconsideration further narrowed and clarified Plaintiffs' claims. Following the motion for reconsideration, Plaintiffs' total pending federal claims dropped from 5 to 4 – 1 for Hannah, 0 for Irving and 3 for Barham.

The ruling on the Motion for Summary Judgment underscored the differences between the parties' claims. The court found issues of fact prevented dismissal of Barham's discriminatory termination claim because an "exception" was sought with respect to the termination of a white MAPM co-worker and a white "trailing spouse" was placed in Barham's former MAPM position. (Ruling on Motion for Summary Judgment, ECF no. 255 at pp. 15, 28-30)  There were no such issues of fact surrounding Hannah's termination. (Id. at pp. 25-28)  The court found issues of fact prevented dismissal of Barham's discriminatory failure to rehire claim because no African American candidates were selected for the MAPM and Operations positions for which he applied - Req. Nos. 3117, 158001, 167299, 167433, and 169519.  (Ruling on Motion for Summary Judgment, ECF no. 255 at pp. 10, 15, 20-21)  There were no such issues of fact preventing dismissal of Hannah's discriminatory failure to rehire claim. (Id. at pp. 9, 16, 18-20)

Finally, the court found issues of fact prevented dismissal of portions of Barham's and Hannah's retaliatory failure to rehire claims because of the temporal proximity between their

---

[3] Plaintiffs also filed a motion for reconsideration, which was denied in its entirety. (ECF no. 295).

discrimination charges and the selection of other candidates for certain positions. (Ruling on Motion for Reconsideration at ECF no. 295 at pp. 3, 6). As a result, the number of positions Hannah applied for that remained at issue was reduced to 7. (Id. at p. 6).  Likewise, Barham's retaliatory failure to rehire claim was narrowed to just 1 position. (Id. at pp. 6-7)

On June 28, 2016, Plaintiffs filed a Notice of Appeal despite the obvious absence of a final judgment. (ECF no. 296). That appeal was dismissed as premature on December 28, 2016. (ECF no. 357).  The Second Circuit denied Walmart's motion for sanctions, deferring to this Court to address the issue of sanctions in the first instance in connection with its already pending Order to Show Cause regarding the imposition of sanctions on Plaintiffs' counsel. (Id.)

On August 26, 2016, Walmart filed a motion to separate the trials of Hannah's single remaining claim from Barham's three remaining claims. (ECF nos. 318 and 319). That motion was premised upon the difference in the number of remaining disputes, as well as the separate and distinct testimony and evidence expected to be submitted in connection with Hannah's and Barham's remaining claims. (Id.)

On January 6, 2017, the Court granted Walmart's motion for separate trials. (ECF no. 362). In reaching that determination, the court observed: "Although the claims in this case initially arose out of the same transaction or occurrence – namely, the corporate reorganization that purportedly led to the termination of Ms. Hannah, Mr. Barham and Mr. Irving – most of the common ground between the parties was eliminated when the Court decided to reconsider its summary judgment ruling. . . . The two Plaintiffs share one claim in common, the retaliatory failure to rehire claim; however, this claim involves different sets of facts, since the parties undertook separate job searches involving separate positions and separate decision-makers. **The majority of the issues of law and fact raised by the parties, therefore, are distinct and**

**properly severable. . . . As a result of the Court's order on Wal-Mart's motion for reconsideration, the two sets of claims remaining in this case no longer arise out of the same transaction or occurrence. They now present distinct questions of law or fact, and they involve different witnesses and documentary proof."** (Id.)(emphasis added).  Thus, after the court expressly recognized that Hannah's and Barham's claims were not inextricably linked, Hannah's sole surviving claim and Barham's three surviving claims proceeded to trial separately.

Jury selection for the Barham trial took place on February 28, 2017. (ECF no. 408). Testimony in the Barham trial took place between March 1, 2017 and March 8, 2017. (ECF nos. 413, 415, 417, 421, 422, and 427).  On March 8, 2017, the jury entered a verdict in favor of Mr. Barham. The jury awarded $5,000,000 dollars in punitive damages and $550,000 in compensatory damages. Importantly, the jury verdict found in favor of Walmart on Mr. Barham's claims of discriminatory termination and discriminatory failure to rehire. Thus, the Plaintiffs did not prevail on any of the discriminatory termination, retaliatory termination, or discriminatory failure to rehire claims they commenced in their two separate complaints.  Mr. Barham only prevailed on the retaliatory failure to rehire claim that was reduced to one of the jobs he applied for after his termination, a claim that was completely separate and distinct from any of the claims brought by the other Plaintiffs.

On March 9, 2017, after the Barham trial was concluded, but before the Hannah trial commenced, Plaintiffs filed a motion to amend their complaints to add 42 U.S.C. §1981 claims. (ECF no. 423).  Not only was this motion filed after the conclusion of Mr. Barham's trial, but it was also four-and-a-half years after the claims filed in 3:12-cv-1361 (September 2012) and three-years-and-four-months after the claims filed in 3:14-cv-1808 (December 2014). If granted, that motion would have doubled the number of pending claims and would have permitted the

Plaintiffs' to pursue claims that were not subject to the §1981a damage caps. On April 3, 2017, before testimony commenced in the Hannah trial, the court denied Plaintiffs' motion to amend their long pending Complaints. (ECF no. 530). As a result, the §1981a damage caps remained in effect.

Jury selection for the Hannah trial took place on March 20, 2017. (ECF no. 479). Testimony in the Hannah trial took place between April 3, 2017 and April 6, 2017. (ECF nos. 530, 544, 545 and 546). At the conclusion of Plaintiff's case, Walmart moved for Judgment as a Matter of Law Pursuant to Rule 50 of the Federal Rules of Civil Procedure. (ECF nos. 548 and 549). On April 7, 2017, this court granted Walmart's Rule 50 motion. (ECF no. 552). Thus, like Mr. Irving, Ms. Hannah prevailed on none of the many claims that she pursued.

Following the trials, a hearing in damages was held on May 30, 2017. (ECF no. 585). Mr. Barham sought well in excess of one million dollars in lost back pay, lost front pay and other lost benefits. (ECF no. 571). Walmart opposed Barham's claims, stressing the uncontroverted facts that he had only prevailed on one claim pertaining to one MAPM position, he was reemployed by Walmart as a Co-Manager a few months after he was denied that position, and that he earned substantially the same amount of money while receiving comparable benefits as a Co-Manager as the person that had been hired for the MAPM position he did not receive. (ECF nos. 570, 575 and 585).

On June 9, 2017, Walmart filed a motion to impose the §1981a damage caps and for further remittitur of the jury award. (ECF nos. 593-94). On August 30, 2017, the court granted Walmart's motion to impose §1981a damage caps and issued its ruling on the issue of equitable damages for back pay, front pay and other relief. (ECF no. 618). The $5,550,000 awarded by the

jury was reduced to $300,000. (Id.)  Of the $1,035,090.80 plus interest and other relief Mr. Barham pursued at the hearing in damages, he was awarded $238,678. (Id.)[4]

Summarizing the foregoing, Hannah initially pursued 9 state and federal claims in 12-cv-1361 and 4 state and federal claims in 14-cv-1808. She prevailed on *none* of those 13 claims. Similarly, Mr. Irving pursued 9 state and federal claims in 12-cv-1361 and 2 state and federal claims in 14-cv-1808. He prevailed on *none* of those 11 claims. Mr. Barham pursued 6 state and federal claims in 12-cv-1361 and 4 state and federal claims in 14-cv-1808.  Barham prevailed on only 1 of his 10 claims. Thus, of the combined total of 34 state and federal claims the three Plaintiffs pursued in 2 separate complaints, one plaintiff prevailed on 1 claim of retaliatory failure to rehire.  Further, of the dozens of jobs that Mr. Barham claimed he had been denied due to discrimination or retaliation, he was only able to prove that he had been denied 1 position as a result of retaliation.

Not only is the number of successful claims in this case a small fraction of the claims the Plaintiffs pursued, but the amount of damages Mr. Barham will recover is a small percentage of what he sought. Of the $5,550,000 Mr. Barham was awarded by the jury, he is only able to collect $300,000 in punitive and compensatory damages. This reduction is because both complaints initiated by 12-cv-1361 and 14-cv-1808 were not served in a timely fashion resulting in the dismissal of the uncapped state law claims.  Further, the effort to add 42 U.S.C. §1981 claims, which are also not subject to the §1981a damage caps, to the long pending complaints was denied because it was not filed until after the Barham trial had concluded.  Finally, of the

---

[4] Mr. Barham was also awarded reinstatement.  Rather than a punishment being imposed on Walmart, this award recognized that Mr. Barham had been reemployed by the company since May 2011 and continued to work there without the type of acrimony that would have weighed against reinstatement. (ECF no. 618, p. 21).

$1,000,000 plus Mr. Barham sought in equitable damages for back pay, front pay, other lost benefits and prejudgment interest, he was awarded $238,678. (Id.)[5]

## IV.    ARGUMENT

In successful Title VII actions, "the court, in its discretion, **may** allow the prevailing party ... a **reasonable** attorney's fee." 42 U.S.C.2000e-5(k) (emphasis added).    "In determining reasonable attorney's fees, a district court must calculate a lodestar figure based upon the number of hours reasonably expended by counsel on the litigation multiplied by a reasonable hourly rate." *Reiter v. MTA New York City Transit Authority*, 457 F.3d 224, 232 (2d Cir.2006).    The Second Circuit has repeatedly stressed the need to view such awards with an "eye to moderation" so as "to avoid either the reality or the appearance of awarding 'windfall fees.' " *Hubbard  v. Total Communications, Inc.*, Civ. Action No. 3:05-cv-1514 (VLB), 2010 WL 1981560, at *2 (D. Conn., May 18, 2010), quoting *Beazer v. New York City Transit Authority*, 558 F.2d 97, 101 (2d Cir.1977), *rev'd on other grounds*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979). *See also Ferguson v. Fairfield Caterers, Inc.*, 3:11 CV 1558 (JAM), U.S. Dist. LEXIS 66049, (D. Conn., May 20, 2015).    Plaintiff's motion is completely unreasonable. Rather than a moderate proposal commensurate with the outcome of the litigation, Plaintiff's counsel seeks an attorney's fee award that would clearly amount to a windfall. This effort must be rebuffed.

"The size of an award of attorney's fees lies largely within the discretion of the district court. However, the Second Circuit has established a two-step process for the method of exercising that discretion in calculating awards." *Hubbard*, *supra*, citing *Cohen v. West Haven Board of Police Commissioners*, 638 F.2d 496, 505 (2nd Cir.1981).    The first step is a

---

[5] In addition to proceedings on the Plaintiffs' actual claims, there are also proceedings addressing Plaintiffs' counsel's conduct during this litigation and at the Hannah trial. The court's consideration of its Orders to Show Cause regarding the imposition of sanctions remains *sub judice*. (ECF nos. 316, 580, 609 – 617, 620-622, 624).

quantitative analysis in which the court establishes a "lodestar" or "presumptively reasonable" figure, obtained "by multiplying the number of hours expended by each attorney involved in each type of work on the case by the hourly rate normally charged for similar work by attorneys of like skill in the area." *Id.* Next, the court conducts a qualitative analysis in which it "may adjust the lodestar figure upward or downward to take account of such subjective factors as the risk and complexity of the litigation and the quality of the representation. Under these procedures, a different rate of compensation may well be set for different types of litigation tasks, and an attorney whose rates are higher than those prevailing in the community may well receive less than his own usual charges." *Id.*

The fee applicant bears the burden of establishing both the entitlement to a fee award and the reasonableness of the fee claimed. *Hubbard*, *supra*, citing *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). This burden is met only by making an appropriate evidentiary showing, and the opposing party does not bear the burden of presenting countervailing evidence of the unreasonableness of a fee application. *Hubbard*, *supra*, citing *Rand–Whitney Containerboard L.P. v. Town of Montville*, Civ. No. 3:96CV413 (HBF), 2006 U.S. Dist. LEXIS 75870, at *20-21 (D.Conn. Sept. 5, 2006).

A.  Plaintiff's lodestar calculation is fundamentally flawed.

"As to the hourly rate, a district court has discretion but should begin generally with 'the prevailing market rates in the relevant community.'" *Genn v. New Haven Board of Education*, 3:12-cv-00704 (CSH), 2017 WL 3022321, (D. Conn. July 17, 2017) quoting *Perdue v. Kenny A.*, 559 U.S. 542, 551 (2010). Determining the reasonable hourly rate for a given case requires "a case-specific inquiry into the prevailing market rates for counsel of similar experience and skill to the fee applicant's counsel." *Genn, supra*, quoting *Farbotko v. Clinton Cty. of N.Y.*, 433 F.3d

12

204, 209 (2d Cir. 2005). "[T]he fee applicant has the burden of showing by satisfactory evidence--in addition to the attorney's own affidavits--that the requested hourly rates are the prevailing market rates." *Id*. Ultimately, the rates sought must align with those "a reasonable and informed real-world client" would approve. *Ferrari v. U.S. Equities Corp*., No. 3:13-CV-00395(JAM), 2015 WL 6383467, at *1, (D. Conn. Oct. 22, 2015), *aff'd in part*, 661 Fed. Appx. 47 (2d. Cir. 2016). Plaintiff fails to meet this burden.

    As an initial matter, Plaintiffs' counsel argues that her requested $650 per hour rate is appropriate because that is what she charges her clients. That circular argument ignores the legal requirement that she support her argument by comparison to the market rate. *Genn,* and *Farbotko supra*. Moreover, despite a lengthy recitation of her education, prior employment positions, and purported experience in employment law, she fails to reference a single trial or appeal in which she secured a favorable result on behalf of a plaintiff in an employment matter. Other than her naked assertion, she provides no objective support for her alleged expertise in employment litigation. As reflected below, her performance in this matter belies that assertion.

    To the extent she engages in any effort to compare herself to peers in the community, she co-opts an affidavit from Attorney Joseph Garrison submitted on behalf of Attorneys Greg Adler and Mary Kelly in *Vera v. Alstom Power Inc.*, 3:12-cv-00382 (VAB). While that affidavit has nothing to do with Plaintiffs' counsel, the rates set forth in that affidavit are notable. As summarized in his affidavit, Joe Garrison is a nationally recognized plaintiff's side attorney and arbitrator; he lists his rate as $575 per hour. He lists other attorneys in his office, with varying degrees of experience, all of whom are highly regarded; their rates range from $325 to $500 per hour. Given Mr. Adler's and Ms. Kelly's recognized experience and work quality, Mr. Garrison states that they would bill at $500 per hour and $450 per hour, respectively, if they were

13

members of his firm.  Plaintiffs' counsel provides no rational, objective basis to conclude why she would bill far more than Mr. Garrison, much less Mr. Adler or Ms. Kelly.  Indeed, as set forth below, her performance in this matter suggests that she should bill at considerably less than the lowest level attorney referenced in Mr. Garrison's affidavit.

Plaintiffs' counsel's argument regarding the location of her office and the conduct of the trials in Fairfield County is also contrary to logic.  As an initial matter, cases in the District of Connecticut are assigned randomly.  In fact, this matter was originally assigned to Judge Hall in New Haven.  The fact that the trials took place in Fairfield County is strictly a matter of chance, which should not prompt an elevation of the hourly rate.  Likewise there is no evidence that the Plaintiffs worked or resided in Fairfield County.  To the contrary, their Complaint states that they worked in New Haven, Bristol and Waterford. (ECF no. 1)  As such, their location does nothing to warrant their use of a Fairfield County attorney and the rates Plaintiffs' counsel seeks.

Plaintiffs' counsel argues that her proposed rate represents a notable deduction from the rate she charged when she was a partner in a New York.  Of course, that assertion ignores a significant milestone that prompted counsel's departure from that firm and practicing in New York: she was subject to severe discipline. She was suspended from the Southern District of New York for seven years. The District of Connecticut, State of Connecticut, and State of New York imposed reciprocal discipline. The Supreme Court of the United States and State of Maryland disbarred Plaintiffs' counsel outright.  Most recently, the State of New York denied Plaintiffs' counsel's effort to be reinstated to the bar of the State of New York.  Contrary to any argument posited by Plaintiffs' counsel, the decision recently rendered by New York makes clear that that denial is not merely reciprocal discipline, but new discipline for conduct following her initial

discipline.[6] Notwithstanding Plaintiffs' counsel's effort to distance and discount her disciplinary history, the severity and on-going nature of that discipline must be factored into her market rate. In view of her severely tarnished professional record, no "reasonable and informed real-world client" would pay $250 per hour, much less the premium rate of $650 per hour.

Finally, the lodestar method "is intended to 'produce[ ] an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case.'" *Ferrari v. U.S. Equities Corp.*, 661 Fed.Appx. 47, at *51 (2d. Cir. 2016), quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010) (emphasis omitted). "That is because '[h]ours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority.'" *Ferrari* 2015 WL 6383467, quoting *Hensley v. Eckhart*, 461 U.S., at 434. In view of her performance in this action, no knowledgeable paying client would pay plaintiff's counsel $250 per hour, much less $650 per hour.

In that connection, the court should consider Plaintiffs' counsel's failure to serve the complaints on a timely basis. Indeed, the court should focus on Judge Hall's observations that the failure to timely serve the 14-cv-1808 complaint was particularly egregious because it was the same error made in 12-cv-1361. The failure to pursue an amendment to add §1981 claims until *after* the Barham trial. These repeated errors permitted the §1981a damage caps to remain in effect throughout this litigation, which directly resulted in the reduction of the Barham verdict

---

[6] In anticipation of this issue being raised in opposition to her fee application, Plaintiffs' counsel preemptively argues that this is merely an *ad hominem* attack. Consistent with her past practice of engaging in *ad hominem* attacks on defense counsel, Plaintiffs' counsel broadens the circle of her attack to an attorney in New York that did nothing more than make the undersigned aware of the discipline imposed by the SCOTUS and State of New York. While Plaintiffs' counsel's attack on that attorney is based on obvious hearsay, all concerns about Plaintiffs' counsel have been based on previously submitted official decisions of the Supreme Court of the United States, State of Maryland, and State of New York.

from $5,550,000 to $300,000. No paying client would pay $250 per hour for that caliber of work, much less $650 per hour.

These errors were compounded by a litany of other missteps and shoddy work. Plaintiffs' counsel engaged in a wide variety of conduct that could not be properly billed to her clients: excessive motions for extensions of time, repeated submissions of amended and corrected pleadings, improper discovery tactics, unsupported arguments in opposition to summary judgment, an obviously premature appeal, and sanctionable conduct during trial. While any attorney can make an occasional error, Plaintiffs' counsel made significant errors and engaged in improper conduct repeatedly throughout this case. Indeed, some of the conduct was sufficiently severe enough to prompt two Orders to Show Cause regarding the possible imposition of sanctions. No paying client would countenance charges of $250 per hour for this type of unproductive churning and improper conduct, much less $650 per hour. Certainly, Defendants shouldn't be expected to pay for it. *Ferrari* and *Hensley*, *supra*.

With all these facts in mind, Plaintiffs' counsel's requested hourly rate must be reduced dramatically because "the quality of a prevailing party's counsel's representation normally [is] reflected in the reasonable hourly rate," *Ferrari*, 661 Fed.Appx. 47, at *50, citing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. at 553, 130 S.Ct. 1662 (internal quotation marks omitted); accord *Millea v. Metro–N. R.R. Co.*, 658 F.3d 154, 168 (2d. Cir. 2011). Counsel's performance in this case was not of the quality to command the hourly rate requested. This court is empowered to reduce the requested rate significantly based on its own familiarity with the relevant legal market in order to determine "the rate a reasonable client in that market would willingly pay". *Ferrari*, 661 Fed.Appx. 47, at *50, citing *Farbotko v. Clinton County*, 433 F.3d 204, 209 (2d Cir. 2005). The Second Circuit will "generally defer to its assessments on such

16

matters, particularly when it is informed by first-hand experience with the deficient quality of representation." *Ferrari, supra,* citing *Carter v. Incorporated Village of Ocean Beach*, 759 F.3d 159, 167 (2d Cir. 2014), *Fox v. Vice*, 563 U.S. 826, 838, 131 S.Ct. 2205, 180 L.Ed.2d 45 (2011) (recognizing that court may take its "overall sense of a suit" into account in calculating fees, and that reviewing courts will defer to assessment because "[w]e can hardly think of a sphere of judicial decision making in which appellate micromanagement has less to recommend it"). Accordingly, there would be no abuse of discretion in a severe reduction of the requested hourly rate in this matter.

The hours proposed in this matter also call for a reduction in the lodestar calculation. Proffered hours are reasonable if "at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Genn, supra,* quoting *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992). However, "[w]henever the district court augments or reduces the lodestar figure, it must state its reasons for doing so as specifically as possible." *Genn, supra,* quoting *Cohen v. W. Haven Bd. of Police Comm'rs*, 638 F.2d 496, 505 (2d Cir. 1980) (internal quotation marks omitted). For example, "in dealing with items that are excessive, redundant, or otherwise unnecessary, the district court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application." *Genn, supra,* quoting *Hines v. City of Albany*, 613 Fed.Appx. 52, at *54-55 (2d Cir. 2015) (internal quotation marks omitted). Likewise, a district court may deduct a percentage of hours where proffered time entries are overly vague. *Genn, supra,* quoting *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 172-73 (2d Cir. 1998).

Identifying specific time entries to remove is not an appropriate approach in this matter. Plaintiffs' counsel's time records are fundamentally flawed for that purpose. As an initial matter,

counsel admits that they are not contemporaneous records; instead they are extrapolations from notes in her personal calendar cross checked against docket entries. (ECF nos. 632, para. 19 and 634-2, para. 19).  Further, aside from entries that reference a specific Plaintiff, the entries do not provide the degree of specificity that would permit the court to cull out the time spent on the majority of unsuccessful claims. Instead, they are undetailed, block entries.  In view of the indisputable fact that the overwhelming majority of the three Plaintiffs' claims were dismissed, counsel's records provide no basis whatsoever to ascertain what time was spent on the sole successful claim. This failure warrants broad brush reduction of Plaintiff's fee application.

As Judge Haight recently observed: "The Supreme Court in *Hensley* quoted with approval a First Circuit opinion, warning counsel that, 'As for the future, we would not view with sympathy any claim that a district court abused its discretion in awarding unreasonably low attorney's fees in a suit in which plaintiffs were only partially successful if counsel's records do not provide a proper basis for determining how much time was spent on particular claims.'" *Genn, supra,* quoting *Hensley*, 461 U.S. at 437 n. 12 (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 279 (1st Cir. 1978)). "[E]ven accepted as contemporaneous, this work log does not meet the well-established *Carey* standards of the Second Circuit.  As discussed in the Court's prior Order, the proffered work log is exceedingly vague, does not adequately characterize the 'nature of the work done,' and contains multiple entries which do not so much as indicate the date on which the claimed hours were accrued." *Genn, supra,* citing *Conn. Hosp. Ass'n v. O'Neill*, 891 F.Supp. 687, 691 (D. Conn. 1994); *Gonzalez v. Town of Stratford*, 830 F. Supp. 111, 114 (D. Conn. 1992); *U.S. Football League v. Nat'l Football League*, 704 F. Supp. 474, 477 (S.D.N.Y. 1989), *judgment aff'd*, 887 F.2d 408 (finding that a 30% reduction over claimed amount was appropriate for limited success and "vagueness in the documentation of certain time entries").

Plaintiffs' counsel argues that the number of hours spent litigating this case were due to Walmart's "scorched earth" tactics.  This argument fails.  Any suggestion that Walmart is responsible for the "scorched earth" litigation tactics in this matter is belied by comparison of this litigation to other Walmart matters involving the same defense counsel facing different plaintiffs' attorneys.  In *Hayden v. Walmart*, 3:12-cv-01251 (WWE), discovery was completed and the matter was disposed of on summary judgment in 50 docket entries.  Likewise, in *Dotel v. Walmart*, 3:12-cv-00825 (SRU), discovery was completed and the matter was disposed of on summary judgment in 69 docket entries.  Summary judgment was affirmed in both of these matters. *Hayden,* 14-3212-cv and *Dotel,* 15-76-cv.  Similarly low docket entry counts through summary judgment are reflected in other matters defended by the undersigned on behalf of other clients. See *Sagliano v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 3:12-cv-01503 (JAM) (63 docket entries) and *Gooding v. Walgreens Home Care, Inc.*, 3:11-cv-00856 (JCH)(77 docket entries).  In contrast, the order on Walmart's motion for summary judgment in this case is docket number 255.[7]  As explained above, this inflated docket count is readily attributable to Plaintiffs' counsel's failures in serving the case properly, engaging in improper discovery tactics, pursuing a premature appeal, and a variety of other tactics and actions that have unnecessarily complicated and delayed this matter.  As a result, the amount of time spent should be radically excised.  Given the comparison of this case to other similar matters, the number of hours that are properly billable should be cut by two thirds.

---

[7] That fact that this matter went all the way through trial also fails to account for the elevated docket entry count.  Plaintiffs' counsel used an affidavit from *Vera v. Alstom Power*, 3:12-cv-00382 (VAB), to support her asserted hourly rate.  Not only does that affidavit fail to provide the proffered support for her requested hourly rate, but the docket sheet from that case also undercuts Plaintiffs' counsel's arguments regarding the time spent in this case.  Like this case, the *Vera* case went all the way through trial and post-trial motions.  Unlike this case, the docket report ends at entry 206, less than a third of the entries in this case.  That disparity underscores the need to "trim the fat."

B.  Other factors warranting reduction of the fee application.

In addition to addressing the components of the lodestar calculation, there are further

bases for reduction of the fee sought by Plaintiffs' counsel.  Rather than accept the Plaintiff's

proposed fees, it falls to the court to determine a presumptively reasonable fee, based on a

reasonable hourly rate and the number of reasonably expended hours. *Ferguson*, *supra*, *citing*

*Bergerson v. N.Y. State Office of Mental Health*, 652 F.3d 277, 289–90 (2d Cir.2011).  In

assessing the reasonable number of hours and whether the requested compensable hours should

be subject to reduction, the Court also considers "the degree of success obtained by the plaintiff,"

*Ferguson*, *supra*, *quoting Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 152

(2d Cir.2008); *see also*, *Hensley v. Eckerhart, 461 U.S. 424, 436 (1983)*(holding that where "a

plaintiff has achieved only partial or limited success," full compensation for attorney's fees may

not be reasonable.)  When appropriate, "[t]he district court may either attempt to identify specific

hours that should be eliminated, or it may simply reduce the award to account for the limited

success." *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 414 (2d Cir. 1989),

*quoting Hensley*, 461 U.S. at 436-37.

In view of the extremely limited degree of success Plaintiffs achieved in this matter, a

dramatic reduction in the fees requested is warranted. *U.S. Football League v. Nat'l Football

League*, 704 F. Supp. 474, 477 (S.D.N.Y. 1989), *judgment aff'd*, 887 F.2d 408 (finding that a

30% reduction over claimed amount was appropriate for limited success). *See also Negron v.

Mallon Chevrolet, Inc.*, No. 3:08-CV-182 (TPS),  2012 WL 4358634, at *5 (D.Conn. Sept. 24,

2012) (reducing fee request by 30% for limited success in claims); *Milde v. Hous. Auth. of Town

of Greenwich*, Civil No. 3:00 CV 2423 (AVC), 2006 WL 6908276, at *13 (D.Conn. Dec. 20,

2006) (reducing fees by 30% based on fact that some claims were "wholly unsuccessful"). Given

the fact that the records are not contemporaneous, the records provide inadequate detail, and the Plaintiffs only prevailed on 1 claim out of 34 and that solitary claim was completely distinct to Mr. Hannah, the total number of hours recoverable should be reduced by at least 70%.

A 70% reduction factor is consistent with *Blumenschine v. Professional Media Group, LLC.*, Civ. No. 3:02CV2244 (HBF), 2007 WL 988192, *15-21, D. Conn. March 30, 2007). In that matter, Attorney Scott Lucas sought $385 per hour. Attorney Lucas is an employment litigator located in Fairfield County with over 20 years of experience. Not only is his location and length of experience comparable to Plaintiffs' counsel here, but there is no reference to any of the disciplinary issues and practical excesses evidenced in this matter. The court found that a $300 per hour rate was appropriate for Attorney Lucas. Moreover, in connection with the degree of success analysis, the court recognized that the Plaintiff prevailed on only 1 of 9 claims. As a result, the court determined that a 70% reduction of the requested fee was appropriate. Applying the reasoning of *Blumenschine*, Plaintiffs' counsel's requested hourly rate should be less than $300 per hour and the lodestar amount should be reduced more than 70%.

In addition to assessing the degree of success, the court should also consider the following factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Ferguson*, *supra*, *citing U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 415 (2d Cir.1989); *see also McDaniel*

*v. Cnty. of Schenecta*dy, 595 F.3d 411, 415 (2d Cir.2010) (affirming same factors in "statutory fee-shifting context[ ]"). None of these factors weighs in Plaintiffs favor.

Given the circumscribed nature of Plaintiffs success, the time and labor required to secure victory on Mr. Barham's claim is only a fraction of the total time expanded.  Employment discrimination and retaliation claims are not esoteric practice areas, so the novelty and difficulty of the questions is relatively low.  As set forth in depth above, the skill requisite to perform the legal service properly was not reflected in Plaintiffs' counsel's handling of the case.  In view of the case being delayed by counsel's other trial, and her reference to handling other arbitrations and negotiations while this matter was pending, she was not precluded from other employment due to acceptance of this case.  As discussed above, the amount sought in terms of hourly rate and time expended is far in excess of any customary fee.  The contingent nature of the fee does not support an inflated recovery.[8]  Given the duration of this case, with many extensions and adjournments, no time limitations imposed by the client or the circumstances prevent a decrease in the fee application. In view of the reduction imposed by the untimely service of the complaint - twice - the amount involved and the results obtained support a reduction of the fee application.  As already addressed, the experience, reputation and ability of the attorneys do not prevent a reduction of the fee. To the contrary, Plaintiffs' counsel's past discipline and pending sanctions arguably mandate a reduction in the fees requested.  There are several firms in Connecticut (i.e.

---

[8] Plaintiffs' counsel's argument regarding the fee arrangement she has entered into with Mr. Barham makes little sense. As an initial matter, making a fee arrangement that provides that the plaintiff receives 40% of the gross receipts in the case, including any fee award, does not fit squarely within the Rules of Professional Responsibility. *See* Rules 1.5(a) and (c), as well as Rule 5.4 of the Rules of Professional Responsibility. The arrangement also appears to run afoul of cases discouraging fee arrangements that permit recovery of "fees on fees." See *McClain v. Pfizer, Inc., NO. 3:06-cv-01795 (WWE)* 2013 WL 4776513, *3-4 (D. Conn. Sept. 6, 2013); *Burrell v. Yale University*, No. X02 CV 00-015944-S (CJS), 2005 WL 1670613, *2-3 (Conn. Sup. Ct. May 26, 2005). The argument is also substantively feeble. As with other assertions, the argument that the fee application should not be disturbed because Mr. Barham's share of the fee award would be reduced turns the concept on its head. The jury and the court have already entered a verdict and rulings regarding the amount of damages that Mr. Barham should receive. The statutory fee award could prevent those amounts from being reduced further, but that offset does not warrant a gross inflation of the jury and court award. That, however, is exactly what Plaintiff's argument suggests. That argument should be rejected.

Joe Garrison's firm, Greg Adler's firm, Madsen, Prestley & Parenteau, Sabatini & Associates, Cichiello & Cicchiello, Lucas & Varga, Casper & De Toledo, etc.) whose practices are comprised largely of employment cases involving claims of the sort pursued by the Plaintiffs here, so "undesirability" does not prevent reduction of the fees requested. There is no indication that the nature and length of the professional relationship with the client should prevent reduction of the fee application; while the case has lingered, it is a single litigation matter instead of a lengthy relationship spanning several unrelated matters. Finally, awards in similar cases support the conclusion that a reduction of the requested fee is in order. *See Ferguson*, *Genn*, and *Blumenschine*, *supra*.

In conclusion, Plaintiff's fee award should be reduced dramatically. In view of the rate charged by comparably experienced attorneys in comparable matters in Connecticut, as well as Plaintiffs' counsel's disciplinary history, pending sanctions, and sub-par performance in this matter, the requested hourly rate should be reduced from $650 per hour to $250 per hour. Likewise, the "excessive, redundant, or otherwise unnecessary" hours spent in this matter relative to similar matters, compounded by the impracticality of segregating specific time entries because of the nature and quality of Plaintiff's counsel's time entries, a deduction of fifty per cent of the time entries – from 2,240.20 to 1,120.10 - is necessary to arrive at a reasonable lodestar calculation - $250 x 1,120.10 = $280,025. Further, in view of the undeniably limited success achieved in this matter – 1/34 of the total claims brought – coupled with the fact that the only successful claim has already been determined ***not*** to be "inextricably intertwined" with the dozens of unsuccessful claims, the lodestar calculated fee should be reduced a further seventy per cent - $280,025 – 70% = $83,007.50.

C. Plaintiff's Costs Must also be Reduced

Plaintiff also seeks an award for costs. See Fed.R.Civ.P. 54(d); *Dattner v. Conagra Foods, Inc.*, 458 F.3d 98, 101 (2d Cir.2006) (per curiam )  While "a litigant who is a prevailing party for purposes of attorney's fees is also the prevailing party for purposes of costs," a motion for costs is also subject to reduction. *Ferguson, supra*.

Here, the costs incurred for discovery and other undertakings that are attributable to the dozens of unsuccessful claims should be eliminated. Specifically, all costs incurred for the depositions of people whose testimony had no bearing on Mr. Barham's solitary successful claim. They include: Kim Hannah ($1,034.25 transcript), Tom Irving ($1,468.90 transcript), Anthony Durden ($1,022.39 transcript), Alan Nasson ($853.99 transcript), Sharon Burns ($525 transcript), Richard Bourget ($717.86 transcript), Phil Morris ($1,216.75 transcript), Lance de la Rosa ($811.75 transcript), Anne Thomas ($1,154.22 transcript), Baldomero Silva ($1,260.90 transcript), and Elizabeth Jones ($1,413.75 transcript). To be clear, Walmart does not dispute the costs associated with the depositions that had any bearing on Mr. Barham's sole successful claim (i.e., Monica Mullins, Tony Restuccia, Brian Broadus, Laurie Canales and La'Shion Robinson), but it should not be expected to pay costs that have no cognizable connection with that 1 prevailing claim.  Removing the depositions referenced above reduces the deposition costs by $11,469.76.

For the same reason, the $875.98 room and airfare for travel to Birmingham, AL for the depositions of Anthony Durden and Tom Irving in Birmingham, AL should be eliminated. The $219.12 for a hotel in Horsham, PA for the Lance de la Rosa and Phil Morris depositions should also be cut. The requested $543.98 costs associated with driving to Newark, NJ for the deposition of Elizabeth Jones, driving to Horsham, PA for the depositions of Lance de la Rosa

and Phil Morris and driving to the Hannah trial must also be eliminated. This reduces the cost application by another $1,649.08.

In addition to these clearly unrecoverable costs, certain costs must be reduced to excise the portions attributable to unsuccessful claims. For instance, Dr. Dolde's initial charge of $3,000, dated 10 October 2014, must be reduced by $2,000 down to $1,000 to deduct the portions attributable to work on the dismissed claims of Ms. Hannah and Mr. Irving. Also, to the extent that the costs submitted are subject to the same lack of clarity as the time records, such as $5,250.93 in PACER and West Law charges, $2,260.51 for Staples and Kinko's copying services, $978.97 for Ricoh copying charges, $513.34 for rental cars and taxis, $303.38 in meals, $192.17 for FedEx and USPS charges, they should be subject to a similar 50% across the board reductions as the attorney's fees. This amounts to a further reduction in the bill of costs in the amount of $6,749.65.

Accounting for costs that are clearly not attributable to the sole successful claim in this matter, as well as 50% of the unallocated costs, the "Grand total: $37,360.78" in costs must be reduced to: $17,492.29.

## V.    CONCLUSION

Plaintiff's motion for attorney's fees and costs is fundamentally flawed. It does not seek a reasonable hourly rate for Plaintiff's counsel, it does not reflect a reasonable amount of time spent prosecuting the matter, and it does not account for the severely limited amount of success achieved. All of these factors warrant a dramatic reduction in the amount of fees sought. Moreover, the bill of costs submitted by Plaintiff does not account for costs incurred in connection with the dozens of claims that were unsuccessful. Accordingly, the requested fees must also be reduced significantly.

Respectfully submitted,

WAL-MART STORES EAST, L.P. and
WAL-MART STORES, INC.,

By: */s/ Craig T. Dickinson*_____
Craig T. Dickinson (ct18053)
Alison Day (*pro hac vice*)
LITTLER MENDELSON, P.C.
265 Church Street, 3rd Floor
New Haven, Connecticut  06510
Tel.  203.974.8717
Fax  203.823.4456
cdickinson@littler.com
aday@littler.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2017, a copy of the foregoing was filed electronically and served by mail on anyone known to be unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

/s/ Craig T. Dickinson_____
Craig T. Dickinson